UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
THE CITY OF NEW YORK,

      Plaintiff,

-against-

MILHELM ATTEA & BROS., INC.,
DAY WHOLESALE, INC.,
GUTLOVE & SHIRVINT, INC.,
MAURO PENNISI, INC.,
JACOB KERN & SONS, INC.,
WINDWARD TOBACCO, INC., and
CAPITAL CANDY COMPANY, INC.,

      Defendants.
----------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
06-CV-3620 (CBA)

AMON, Chief United States District Judge:

## INTRODUCTION

The City of New York has brought an Amended Complaint against the above-captioned defendants, cigarette wholesalers who are state-licensed cigarette stamping agents. The principal contention of the City is that the wholesalers violated the Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. § 2341 et seq., by shipping in excess of 10,000 unstamped cigarettes to Native American reservation retailers who re-sold the cigarettes to the public. According to the City, the former version New York Tax Law § 471 applied a tax to cigarettes sold to reservation retailers for re-sale to the public, and the defendant agents violated that provision by distributing large quantities of cigarettes to reservation retailers without purchasing and affixing the requisite state tax stamps. The City currently seeks civil penalties or disgorgement of profits pursuant to the CCTA, and also brings state law claims for public nuisance and violations of the Cigarette Marketing Standards Act ("CMSA"), New York Tax Law § 484. The parties have engaged in

multiple rounds of motion practice, as well as some discovery, and now cross-move for summary judgment.

The defendants' principal contentions are that the City lacks standing to pursue this action against them, that they were not legally required to affix state tax stamps to the cigarettes at issue, and that they lack the requisite scienter for liability.  The City counters that the defendants' arguments can all be rejected as a matter of law, and that there are no outstanding issues of material fact regarding its entitlement to monetary relief under the CCTA.

For the reasons stated below, the Court grants summary judgment to Day Wholesale, Inc. on the grounds that the City has failed to put forth sufficient evidence that it suffered an injury-in-fact from Day's sales of unstamped cigarettes.  The Court concludes that the City is entitled to summary judgment on the issue of the liability of defendants Gutlove & Shirvint, Inc. and Mauro Pennisi, Inc. for CCTA violations, and that some amount of civil penalties is appropriate.  The Court will hold a further hearing for the purpose of assessing the penalty amount.  The Court denies the cross-motions as to the City's CMSA claim, and deems the public nuisance claim withdrawn.

## BACKGROUND

### I.  NEW YORK'S CIGARETTE TAX SCHEME

The City bases its CCTA claim on the defendants' failure to place New York State tax stamps on cigarettes they sold to Native American reservation retailers.  In addressing the cross-motions, it is helpful first to set out both the New York taxing scheme, as well as the discussions in two recent cases which interpret the provisions of that scheme.

Article 20 of the New York Tax Law imposes a tax on all cigarettes possessed for sale or use in New York State, except for those cigarettes that New York is "without power" to tax.  See

2

N.Y. Tax L. § 471; Dep't of Taxation & Fin. of N.Y. v. Milhelm Attea & Bros., Inc., 512 U.S. 61, 64 (1994).  Under § 471, all cigarettes are presumed taxable.  N.Y. Tax L. § 471 (stating that "all cigarettes within the state are subject to tax until the contrary is established, and the burden of proof that any cigarettes are not taxable hereunder shall be upon the person in possession thereof.").

Under New York law, taxes on cigarettes are largely collected through a system of prepayments, with the cost of the tax being passed along the distribution chain to the consumer. See N.Y. Tax Law § 471(2) ("It is intended that the ultimate incidence of and liability for the tax shall be upon the consumer, and that any agent or dealer who shall pay the tax to the tax commission shall collect the tax from the purchaser or consumer."); In re New York Assoc. of Convenience Stores v. Urbach, 92 N.Y.2d 204, 209 (N.Y. 1998).  Wholesalers, such as the defendants in this action, may be licensed by New York as "stamping agents" pursuant to New York Tax Law § 472, and are permitted to sell tax-stamped cigarettes and other tobacco products to registered New York retailers and wholesalers.  N.Y. Tax L. § 472(2) ("The commissioner may license dealers in cigarettes . . . as agents to buy or affix stamps to be used in paying the tax herein imposed . . . .").  The Tax Law provides that these stamping agents "shall be liable for the collection and payment of the tax on cigarettes imposed by this article and shall pay the tax to the commissioner by purchasing, under such regulations as he or she shall prescribe, adhesive stamps of such designs and denominations as he or she shall prescribe."  Id. § 471(2).   Thus, the cost of the tax is typically passed from the stamping agent wholesaler, to the retailer, and ultimately is borne by the consumer.  The purpose of this system is to prevent the widespread evasion of New York cigarette taxes.  See Milhelm Attea & Bros., 512 U.S. at 75.

3

Federal and state governments lack authority to tax cigarettes sold to members of Native American tribes for their own consumption. Thus, cigarettes to be consumed on the reservation by enrolled tribal members are tax-exempt. Milhelm Attea & Bros., 512 U.S. at 64 (citing Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation, 425 U.S. 463, 475-81 (1976)). "On-reservation cigarette sales to persons other than reservation Indians, however, are legitimately subject to state taxation." Id. (citing Washington v. Confederated Tribes of Colville Reservation, 447 U.S. 134, 160-61 (1980)).

On June 21, 2010, the New York State Legislature enacted Senate Bill 8285/Assembly Bill 11515, which amended N.Y. Tax Law §§ 471 and 471-e (the "Tax Law Amendments"). The Tax Law Amendments went into effect on September 1, 2010. The Court will therefore discuss the framework of New York's Tax Law before and after the recent amendments, as well as the relevant case law developments during the course of this litigation.

### A. Pre-Amendment New York Tax Law

Prior to the Tax Law Amendments, New York Tax Law § 471 provided, in pertinent part:

> There is hereby imposed and shall be paid a tax on all cigarettes possessed in the state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax . . . . It shall be presumed that all cigarettes within the state are subject to tax until the contrary is established, and the burden of proof that any cigarettes are not taxable hereunder shall be upon the person in possession thereof.

N.Y. Tax L. § 471(1). No specific exception was made for sales of cigarettes by or to Native Americans or retailers on Native American reservations.

Section 471-e, entitled "Taxes imposed on qualified reservations," provided a specific mechanism for collecting taxes on cigarettes sold on qualified reservation. It stated, in pertinent part:

> Notwithstanding any provision of this article to the contrary qualified Indians may purchase cigarettes for such qualified Indians' own use or consumption exempt from cigarette tax on their nations' or tribes' qualified reservations.  However, such qualified Indians purchasing cigarettes off their reservations or on another nation's or tribe's reservation, and non-Indians making cigarette purchases on an Indian reservation shall not be exempt from paying the cigarette tax when purchasing cigarettes within this state.  Accordingly, all cigarettes sold on an Indian reservation to non-members of the nation or tribe or to non-Indians shall be taxed, and evidence of such tax will be by means of an affixed cigarette tax stamp.

N.Y. Tax L. § 471-e(1)(a).  The statute established a coupon system to ensure that qualified Native Americans had the opportunity to purchase cigarettes exempt from tax.  Id. § 471-e(1)(b); see also id. § 471-e(2) (establishing procedure for distributing tax exemption coupons).

However, the New York State Department of Taxation and Finance ("DTF") failed to implement the coupon system set forth in the statute.  Rather, on March 16, 2006, the DTF issued an advisory opinion stating that it would continue to adhere to its longstanding non-enforcement or "forbearance" policy, whereby it permitted untaxed cigarettes to be sold to and from Native American reservation retailers.  See City of New York v. Milhelm Attea & Bros., Inc., 550 F. Supp. 2d 332, 337-38 (E.D.N.Y. 2008) (history of DTF forbearance policy); United States v. Morrison, 596 F. Supp. 2d 661, 670-72, 675-77 (E.D.N.Y. 2009) (same); State of New York Commissioner of Taxation and Finance, Advisory Opinion Petition No. M06316A, March 16, 2006.  In light of the DTF's inaction, the state Appellate Division, Fourth Department held that § 471-e was without effect.  See Day Wholesale, Inc. v. State of New York, 51 A.D.3d 383, 388-89 (4th Dep't 2008).

## B.  The Cayuga and Morrison Decisions

In Cayuga Indian Nation of New York v. Gould, 66 A.D.3d 100, 884 N.Y.S.2d 510 (App. Div., 4th Dep't, July 10, 2009), the Fourth Department held that § 471-e of the New York Tax Law was the exclusive means for taxing reservation cigarette sales to non-Native Americans, and

that § 471 did not provide an independent basis for taxation.  Because the Appellate Division had previously held that § 471-e was not in effect, the court found that there was at that time no tax applicable to cigarette sales on Native American reservations, regardless of the purchaser.

In City of New York v. Golden Feather Smoke Shop, Inc. et al., No. 08-CV-3966, 2009 WL 2612345, at *29 (E.D.N.Y. Aug. 25, 2009), however, this Court rejected the Fourth Department's conclusions, arguing that the New York Court of Appeals would hold that § 471 imposed an applicable tax on cigarettes sold by reservation retailers to non-tribe members, and that such cigarettes were required to bear tax stamps under New York law.  This Court accordingly imposed a preliminary injunction on several retailers operating on the Poospatuck reservation (several of them customers of Gutlove and Pennisi) who were in the business of selling bulk quantities of unstamped cigarettes to bootleggers, thereby enjoining them from "selling unstamped cigarettes other than to members of the Unkechauge Nation for their personal use."  Id. at *43.

On May 11, 2010, the New York Court of Appeals entered a decision in Cayuga Indian Nation of New York v. Gould, 14 N.Y.3d 614 (2010), affirming, as modified, the opinion of the Fourth Department.  The New York Court of Appeals considered "whether, absent the implementation of a statutory or regulatory scheme addressing the specific tax collection issues posed by the retail sales of cigarettes on Indian reservations, Nation retailers can be prosecuted for the possession and sale of untaxed cigarettes under Tax Law § 471."  Id. at 622.  At the outset, the court squarely stated that "[t]here is no question that Tax Law § 471 generally imposes a sales tax on cigarettes sold in New York," and explained that "the issue in this case is not whether sales taxes are due when non-Indian consumers purchase cigarettes from Indian retailers – they are."  Id. at 647-48.  Notwithstanding the applicability of § 471, however, the

6

court held that criminal enforcement of that section as against Native American retailers was impermissible "without implementation of an appropriate calculation and collection methodology." Id. at 650-54.  The court found that such an ad hoc criminal enforcement scheme was contrary to legislative intent and likely at odds with the Supreme Court's "requirement that a sale tax collection scheme involving Indian retailers be not 'unduly burdensome.'" Id. at 651 (quoting Milhelm Attea & Bros., 512 U.S. at 76).  The court also explained that, "[w]hatever methodology is ultimately used to calculate and collect sales taxes derived from on-reservation retail sales of cigarettes, we would expect that advance notice would be supplied to Indian retailers and that the system would be uniform throughout the state." Id.  Prosecutions against such retailers by individual District Attorneys, the court held, would not achieve that result.  Id.

Although the Cayuga decision found enforcing state criminal sanctions against on-reservation retail sellers impermissible, the Cayuga court specifically distinguished federal cases—including this Court's decision in City of New York v. Golden Feather, 2009 WL 705815 (E.D.N.Y. 2009)—in which § 471's stamping requirement was enforced pursuant to the CCTA against cigarette sellers making "bulk sales" of cigarettes "to a party that intends to resell them of the reservation." Id. at 653.  The court explained:

> [T]he complex calculation and collection issues raised when a state attempts to collect sales taxes from Indian retailers (such as determining which cigarettes possessed for potential sale must contain tax stamps and which need not, and which sales are exempt from taxation because they involve Indian consumer an which are not) are not present when a wholesaler or distributor, whether Indian or otherwise, makes a bulk sale of cigarettes to a party that intends to resell them off the reservation.  The federal tax exemption applies only to on-reservation sales to Indians for their personal use – there is no exemption allowing Indians to engage in the wholesale distribution of untaxed cigarettes destined for off-reservation sales.  Thus, the exemption is not implicated . . . and no special calculation or collection mechanism like the system set forth in Tax Law § 471-e is necessary because not a single pack of cigarettes involved in such a transfer would be tax exempt.

Id.  In such cases, the court found, enforcement of § 471's taxing and stamping obligations would be permissible.  Id.  Accordingly, in City of New York v. Golden Feather Smoke Shop, Inc., 08-CV-3966 (CBA), slip op. at 14-19 (E.D.N.Y. Aug. 16, 2011), this Court declined to vacate the preliminary injunction based on Cayuga.

Recently, in United States v. Morrison, 686 F.3d 94, 2012 WL 2877648 (2d Cir. July 16, 2012), the Second Circuit held that § 471 was not void for vagueness, and that neither Cayuga nor the DTF's forbearance policy invalidated a 2008 RICO conspiracy conviction, predicated on violations of the CCTA and § 471, where the defendant made bulk sales of unstamped cigarettes to non-Native Americans from the Peace Pipe Smoke Shop on the Poospatuck reservation. According to the Second Circuit, Cayuga stood for the proposition that "'large-scale cigarette bootlegging,' involving 'the wholesale distribution of untaxed cigarettes destined for off-reservation sales' constituted the core conduct that Section 471 criminalized."  Id. at *10 (quoting Cayuga, 14 N.Y.3d at 652-53)).  Furthermore, the Second Circuit held that "the normal meaning of 'required,' as contained in the CCTA, is what is mandated by the state statute (Section 471), and not what is enforced by the state executive."  Id.  Accordingly, because there was "no question that the conduct at issue . . . was made unlawful by the terms" of § 471, "New York's decision, for political and practical reasons, to refrain from enforcing Section 471 did not grant Morrison leave to sell massive quantities of untaxed cigarettes to non-Native Americans." Id.  The court went on to observe that CCTA enforcement was particularly appropriate in the case presented, since the CCTA was designed "as a federal statutory 'back-up' for state-level enforcement regimes" in order to "provide federal support to states struggling with circumstances precisely like those that prompted New York's forbearance," which included legal

barriers related to tribal sovereign immunity as well as various forms of civil unrest and tribal resistance.  Id. at *11.

### C.  The Tax Law Amendments

As stated, on June 21, 2010, the New York State Legislature enacted Senate Bill 8285/Assembly Bill 11515, which amended N.Y. Tax Law §§ 471 and 471-e.  The amendments went into effect on September 1, 2010.  Section 471(1), as amended, now reads in pertinent part:

> There is hereby imposed and shall be paid a tax on all cigarettes possessed in the state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax, including sales to qualified Indians for their own use and consumption on their nations' or tribes' qualified reservation, or sold to the United States or sold to or by a voluntary unincorporated organization of the armed forces of the United States operating a place for the sale of goods pursuant to regulations promulgated by the appropriate executive agency of the United States, to the extent provided in such regulations and policy statements of such an agency applicable to such sales. The tax imposed by this section is imposed on all cigarettes sold on an Indian reservation to non-members of the Indian nation or tribe and to non-Indians and evidence of such tax shall be by means of an affixed cigarette tax stamp.

N.Y. Tax L. § 471 (emphasis added).

The amended tax laws create three systems by which cigarettes sold by reservation cigarette dealers may be sold to Native Americans for their own use and consumption without paying the applicable tax.  First, § 471-e creates a "coupon system."  Under that system, the state will provide the tribal government with a number of coupons each quarter based on the probable demand, which the tribe may decide to hold or to distribute to individual Native American retailers.  The coupons may then be provided to a stamping agent in return for stamped cigarettes.  Thus, the Native American retailer will not need to pay the stamping agent the applicable tax; rather, the agent will redeem the coupon to recoup the tax which it had already paid on the cigarettes.

If the tribe declines to participate in the coupon system, § 471(5) creates a default "prior approval" system, pursuant to which the state calculates the probable demand for cigarettes and determines the number of cartons the tribe may sell tax free each quarter.  Any Native American retailer may then purchase stamped cigarettes from a wholesaler without paying the applicable tax.  Before consummating the sale, the wholesaler will check whether there are still available cartons allotted to the tribe, deduct the number sold to the Native American retailer from that allotment, and later obtain a refund or credit for the tax pre-paid on those cigarettes.  A third option is also available to Native American tribes pursuant to § 471(6), which permits the tribes to enter into voluntary tax agreements with the state, subject to legislative or court approval.

### D.  Challenges to the Tax Law Amendments

The effective date of the Tax Law Amendments was September 1, 2010.  Prior to that date, multiple actions were brought to enjoin implementation and enforcement of the Tax Law Amendments.  In two proceedings, the District Court for the Western District of New York rejected requests by the Seneca, Cayuga, and Unkechauge Nations and the St. Regis Mohawk Tribe to enjoin implementation of the Tax Law Amendments.  Seneca Nation of Indians v. Paterson, 2010 WL 4027796, at *17 (W.D.N.Y. Oct. 14, 2010) ("Seneca PI Denial"); Seneca Nation of Indians v. Paterson, 2010 WL 4027795, at *4 (W.D.N.Y. Oct. 14, 2010) ("Seneca Stay"); Unkechauge Indian Nation v. Paterson, 752 F. Supp. 2d 320, 328 (W.D.N.Y. 2010) ("Unkechauge").  However, the court stayed enforcement of the Tax Law Amendments pending appeal.  Seneca Stay, 2010 WL 4027795, at *4 ("[T]he Court hereby grants a stay of enforcement of the New York tax law amendments pending appeal."); Unkechauge, 752 F. Supp. 2d at 328 ("[E]nforcement of the New York tax law amendments is stayed pending appeal.").  The District Court for the Northern District of New York granted a preliminary injunction in an

action brought by the Oneida Nation.  Oneida Nation of N.Y. v. Paterson, 2010 WL 4053080, at

*13 (N.D.N.Y. Oct. 14, 2010).

        Appeals were taken in each of the aforementioned actions.  On May 9, 2011, the Second

Circuit Court of Appeals issued a decision finding that plaintiffs had "failed to demonstrate a

likelihood of success on the merits of their claims that (1) the precollection scheme

impermissibly imposes a direct tax on tribal retailers, or alternatively, imposes an undue and

unnecessary economic burden on tribal retailers; and (2) the coupon and prior approval systems

interfere with their rights of self-government and rights to purchase cigarettes free from state

taxation." Oneida Nation of New York et al. v. Cuomo et al., 645 F.3d 154, 175 (2d Cir. 2011).

The court affirmed the orders of the Western District rejecting the plaintiffs' requests to enjoin

implementation of the Tax Law Amendments and vacated the order of the Northern District

imposing a preliminary injunction.  Id. at 176.  The court vacated all stays pending appeal.  Id.

        Efforts were also made in state court to enjoin the Tax Law Amendments, but as of June

21, 2011 all temporary injunctive relief had been lifted by the state Appellate Division.  See

Seneca Nation of Indians v. State of New York et al., CA 11-01193, slip op. at 1 (4th Dep't June

21, 2011); Day Wholesale, Inc. v. State of New York, CA 10-01813 Slip op. at 2 (App. Div., 4th

Dep't, September 14, 2010).

## II.  RELEVANT FACTS

        The following facts unless otherwise noted are undisputed.

### A.  Gutlove & Shirvint, Inc.

        Cigarette wholesaler Gutlove began selling unstamped cigarettes to reservation sellers,

principally on the Shinnecock and Poospatuck reservations on Long Island, in approximately

1998.  (Declaration of Eric Proshansky, dated December 23, 2011, ("Proshansky Decl."), Ex. 1.)

As a cigarette stamping agent, Gutlove, like all the defendants, was required on a monthly basis

file a Resident Agent Cigarette Tax Report, Form CG-6, with the New York State Department of

Taxation and Finance ("DTF").  See 20 N.Y.C.R.R. § 75.1.  Part I of Form CG-6 requires the

filer to disclose the number of unstamped cigarettes sold during the prior month. Schedule E of

Form CG-6 requires the stamping agent to disclose each retailer to whom sales of unstamped

cigarettes were made and the number of cigarettes sold.

The City has submitted certified copies of Form CG-6 and Schedule E forms submitted

by Gutlove to DTF from January 2004 through January 2011, which reflect the volume of

unstamped cigarettes that Gutlove sold to reservation retailers.  (See Proshansky Decl. ¶ 3, Ex. 2;

Docket No. 249.)  At its peak, in 2006 and 2007, Gutlove was delivering approximately

4,350,000 cartons per year of unstamped cigarettes to the Poospatuck Reservation.  (Proshansky

Decl., Ex. 5.)  From May 2008 through January 2011, Gutlove sold a total of 10,537,885 cartons

of unstamped cigarettes to Native American reservation sellers, nearly all on the Poospatuck

Reservation.  (See Proshansky Decl. Ex. 6.)  As of September 2010, over 88% of Gutlove's total

cigarette sales consisted of unstamped cigarettes sold to reservation sellers; 95% of those sales

were to sellers on the Poospatuck Reservation. (See Proshansky Decl., Ex. 3.)

The City has presented substantial evidence that cigarettes sold on the Poospatuck

reservation were purchased by non-Native Americans in large quantities and trafficked into New

York City.  This evidence includes affidavits from a cooperating informant and several law

enforcement officers, police reports from arrests of City residents for cigarette trafficking near

Poospatuck, and transcripts of testimony from the preliminary injunction hearing in City of New

York v. Golden Feather Smoke Shop, Inc., 08-cv-3966 (CBA).  (See Proshansky Decl., Exs. 30-

33; Supplemental Declaration of Aaron M. Bloom dated Feb. 6, 2012 ("Supp. Bloom Decl."),

Ex. 1; Affidavit of DTF Confidential Informant ("CI Aff."); Affidavit of Christopher Lannon; Affidavit of Tracey Young; Affidavit of Jason Jerome; Affidavit of Byron Mars.)  The City has also presented evidence that at least 59,000 City smokers annually are purchasers of unstamped cigarettes brought into the City from Native American reservations.  (Affidavit of Thomas Frieden ¶ 7.)  Moreover, sales records of Gutlove customer Peace Pipe Smoke Shop show that cigarettes were mailed directly to addresses in the City via phone and internet orders. (Proshansky Decl. Exs. 34, 35 (showing Peace Pipe sales of 415,364 cartons of cigarettes to NYC addresses from Nov. '07 to Feb. '09).)

The City also contends that Gutlove actively assisted in the reservation sellers' cigarette trafficking.  The City has presented evidence that the driver of Gutlove's cigarette delivery truck routinely loaded master cases (60 cartons each) of unstamped cigarettes directly into bootleggers' vehicles on the Poospatuck Reservation and assisted bootleggers in evading detection by police.  (See Proshansky Decl. ¶ 11, Young Aff. ¶¶ 2-12, Lannon Aff. ¶¶ 1-6, DTF CI Aff. ¶¶ 5-8.)  Further, Gutlove was charged with using a fraudulent scheme to continue sales of unstamped Philip Morris cigarettes to Peace Pipe Smoke Shop, after Philip Morris demanded in 2007 that Gutlove stop those sales due to Peace Pipe's connection to cigarette bootlegging into the City.  See Matter of Gutlove & Shirvint, DTA 822533 & 822921 (May 29, 2009) (Proshansky Decl, Ex. 9).  As a result, DTF revoked Gutlove's license to operate as a cigarette stamping agent—a ruling that was affirmed by the Appellate Division, Third Department on November 4, 2010.  Id.; Matter of Gutlove & Shirvint, Inc. v. Tax Appeals Trib. of The State of New York, 911 N.Y.S.2d 214 (3d Dep't 2010).  Gutlove ceased all sales of unstamped cigarettes shortly thereafter.

### B.  Mauro Pennisi, Inc.

Pennisi likewise began selling unstamped cigarettes to Native American reservation sellers in approximately 1998. (See Proshansky Decl., Ex. 11.)  The City has submitted certified copies of Form CG-6 and Schedule E forms submitted by Pennisi to DTF from January 2004 through June 2011.  (See Proshansky Decl. ¶ 15, Ex. 12; Docket Entry No. 249.)  In its peak business years, 2006 and 2007, Pennisi delivered approximately 5.9 million and 5 million cartons, respectively, of unstamped cigarettes to Poospatuck Reservation sellers.  (Proshansky Decl., Ex. 15.)  From May 2008 through June 2011, when its sales ceased, Pennisi sold a total 11,127,538 cartons of unstamped cigarettes to Native American reservation sellers.  (See Proshansky Decl. Ex. 6.)  As of September 2010, 98% of Pennisi's cigarette sales were to reservation cigarette sellers; 96% of those sales were to sellers on the Poospatuck Reservation. (See Proshansky Decl., Ex 13.)  Again, as cited above, the City's evidence demonstrates that large quantities of cigarettes sold from the Poospatuck Reservation were trafficked into the City.

The City has also submitted that Gutlove and Pennisi are the only wholesalers authorized by the Poospatuck tribe to supply cigarettes to reservation sellers, and thus argues that it is reasonably certain that most or all of the cigarettes trafficked from the Poospatuck reservation into the City were supplied by those defendants.  (See Proshansky Decl. ¶ 42, Ex. 36; Unkechauge Indian Nation v. Paterson, 10-cv-711 (RJA) (W.D.N.Y.) Doc. No. 6-2: Affidavit of Chief Harry B. Wallace.)  Pennisi argues in its brief that tribal retailers could have been obtaining some of their cigarettes from other sources as well, but cites no record evidence to support that proposition.  (Pennisi Mem., DE #360, at 10.)

### C.  Day Wholesale

The City has submitted certified copies of Form CG-6 and Schedule E forms submitted by Day Wholesale to DTF from February 2004 through August 2011.  (See Proshansky Decl. ¶ 23, Ex. 19; Docket Entry No. 252.)  Day's Native American reservation customers include the Cayuga, Oneida, Onandaga, St. Regis Mohawk, Seneca, Tonawanda and Tuscarora nations.  In September 2010, over 96% of Day's cigarette sales were to reservation cigarette sellers.  (See Proshansky Decl., Ex. 20.)  In 2006 and 2007, Day delivered approximately 3.5 and 5.8 million cartons of unstamped cigarettes to Native American reservation sellers.  (Proshansky Decl., Ex. 22.)  From May 2008 through June 2011, when its sales ceased, Day sold 15,824,919 cartons of unstamped cigarettes to reservation sellers.  (See Proshansky Decl. Ex. 6.)  However, during the time frame relevant to this case, Day has never sold cigarettes to the Poospatuck reservation or any other reservation on Long Island.  (Day 56.1(a) Stmt., Jan. 23, 2012, ¶ 5.)

The City claims that unstamped cigarettes sold by Day Wholesale to reservation cigarette sellers are purchased by New York City residents.  (See Proshansky Decl. ¶ 31.)  The City's only proof of this fact is evidence that Day Wholesale has supplied large quantities of unstamped cigarettes to entities owned by Scott Maybee, an internet cigarette seller operating on the Seneca reservation—in particular, a Maybee company called U.S. Tobacco Wholesale.  (See Proshansky Decl. ¶ 31 and Exs. 19 (e.g. TAX 007088-7101, 7113-7115) (deliveries to US Tobacco Wholesale), 20 (at TAX 004945) (same), and 21 (same).)  It appears on the current record that U.S. Tobacco Wholesale is the only Maybee entity with whom Day transacted.  (Murphy 2d Supp. Aff. ¶ 33).  In September and October 2008, a City investigator ordered cigarettes from two internet websites operated by Maybee, Smartsmoker.com and OrderSmokesDirect.com, which were all delivered to an address in the City without New York State or City tax stamps.

(See Affidavit of Julio Monell ¶¶ 3-18 and Exs. A-H.)  In total, this investigator made four controlled purchases from the two Maybee websites, of two cartons of cigarettes each.  (Id.)

Maybee does business at 255 Rochester Street, Unit 4, Salamanca, N.Y., where Day Wholesale and several other wholesalers (including Milhelm Attea & Bros., Windward Tobacco, and Gutlove) have made deliveries of unstamped cigarettes.  (See Proshansky Decl., ¶ 31, Ex. 24 (Complaint ¶¶ 3, 5; Answer ¶ 1; Response to Request for Admission No. 3).  The cigarettes ordered by Investigator Monell used that same return address.  (Monell Aff. ¶¶ 5, 9, 13, 17 and Exs. A, C, E, G.)   The invoices for Monell's orders show addresses for Smartsmoker.com and OrderSmokesDirect.com of P.O. Box 110 and P.O. Box 150, Salamanca, N.Y., which are both registered to Scott Maybee. (See Proshansky Decl., Ex. 25; Monell Aff. Exs. A, C, E, G.)

### D.  Defendants' Volume of Sales and Native American Consumption

After the passage of the Tax Law Amendments, the New York State Department of Taxation and Finance passed emergency regulations, effective June 22, 2010, implementing the new provisions. See 20 N.Y.C.R.R. §§ 74.6, 74.7.  In addition to setting forth the procedures for Native American nations or tribes to participate in the coupon and prior approval systems, the regulations announced the "probable demand" allocations for each nation or tribe, i.e., a generous estimate of the number of cigarettes needed to supply the personal requirements of tribe members.  See 20 N.Y.C.R.R. §§ 74.6(e)(1) (describing method of calculating probable demand). The regulations were upheld as properly promulgated in Seneca Nation v. State, 2011 N.Y. App.Div. LEXIS 8274 (4th Dep't November 8, 2011). The probable demand calculations thus provide a useful guide for comparison against the defendants' cigarette sales.  The probable demand allocations, along with each nation's 2000 Census population upon which the allocations were based in part, are as follows:

| Native American Nation or Tribe | Population in 2000 Census | Quarterly Probable Demand Estimate (cartons) |
|---|---|---|
| Cayuga | 947 | 2,010 |
| Oneida | 1,473 | 3,120 |
| Onondaga | 2,886 | 6,060 |
| Unkechauge / Poospatuck | 376 | 810 |
| Seneca (Allegany, Cattaraugus, Oil Springs) | 7,967 | 16,860 |
| Shinnecock | 1,915 | 4050 |
| St. Regis Mohawk | 13,784 | 29,160 |
| Tonawanda Band of Senecas | 256 | 570 |
| Tuscarora | 1,025 | 2,190 |

See 20 N.Y.C.R.R. § 74.6(e)(1).

It is thus clear that the defendants' sales could not have been destined for Native American consumption on the reservations, based on sheer volume alone. For example, the City has prepared the following comparison between the probable demand calculation and the defendants' sales to the reservations during a single month:

| Defendant (and reservations supplied) | Cartons Supplied in September 2010 | Probable Demand Allocation (adjusted to cartons per month) |
|---|---|---|
| Gutlove (Poospatuck) | 378,065 | 270 |
| Pennisi (Poospatuck) | 243,360 | 270 |
| Day Wholesale (Cayuga, Onondaga, Oneida, Tonawanda, St. Regis Mohawk) | 136,585 | 14,310 |

(See Pl. Mem. at 37.)

None of the defendants dispute the fact that they sold and shipped quantities exceeding 10,000 unstamped cigarettes to reservation retailers. Gutlove and Day do not dispute the fact that "some" of the cigarettes they sold were resold to non-Native Americans. (See Pl. Rule 56.1 Stmt, ¶¶ 6, 14, 22; Gutlove 56.1 Response, at ¶ 6; Day 56.1 Response, at ¶ 22.) Day further admits that it "knew" that certain of its customers resold "some" Day cigarettes to members of

the public.  (Day 56.1 Response, at ¶ 23.)  Pennisi refuses to admit expressly that any of its

cigarettes were resold to non-Native Americans.  (Pennisi 56.1 Response, at ¶¶ 14-15.)

     Notwithstanding these representations, no defendant has submitted any evidence to

contradict the inference that may be drawn from the vast disparity between the volume of their

sales and the Native American populations on the reservations that they supplied.[1]  The City's

presentation establishes that the vast majority, if not all, of the unstamped cigarettes the

defendants sold to reservation retailers were resold to and consumed by non-Native Americans,

and that any reasonable wholesaler would have been well aware of that fact.  Indeed, the problem

of public sales of untaxed cigarettes from Native American reservations in New York has been a

subject of legislative, executive, and judicial action and debate since the late 1980s.  See, e.g.,

Milhelm Attea, 512 U.S. at 64-65 ("In 1988, New York's Department of Taxation and Finance

determined that a large volume of unstamped cigarettes was being purchased by non-Indians

from reservation retailers.").  Moreover, while Day disputes whether any of its cigarettes made it

into New York City, an issue addressed infra, on the present record it is uncontroverted that large

quantities of Gutlove and Pennisi cigarettes were trafficked into New York City.  Gutlove and

Pennisi have undoubtedly been on notice of that fact, at least since the time the City brought this

action in 2006 and the Golden Feather action in 2008.[2]  Furthermore, purchases by City residents

of cigarettes from the Poospatuck reservation have been reported publicly since at least 2002.

See Read Their Lips: No Taxes (Period.); Smokers Flocking to Reservations to Buy Cigarettes,

---

[1] In general, the evidentiary support for Gutlove and Pennisi's motions and opposition is essentially
limited to licensing certificates, plus records demonstrating that they collected certain documents from
their customers and reported their sales to DTF.
[2] As noted previously, the record further indicates that in late-2007, Phillip Morris notified Gutlove about
its concerns that cigarettes sold by Gutlove customers were being trafficked into New York City.  See
Matter of Gutlove & Shirvint, DTA 822533 & 822921, at 8 (Proshansky Decl., Ex. 9).

Cheap, N.Y. Times, July 8, 2002; City Tries to Curtail Cigarettes Sales From Reservation, N.Y. Times, Oct. 28, 2008.

### E.  This Litigation

The City filed the complaint in this case on July 24, 2006, alleging that the defendants' sales of unstamped cigarettes to reservation cigarette sellers violated the CCTA and CMSA, and contributed to a public nuisance. This Court denied defendants' motions to dismiss the complaint on April 30, 2008, holding that, in regard to cigarettes sold to reservation retailers for resale to non-Native Americans, § 471 constituted an "applicable" tax that "required" the cigarettes to bear tax stamps, for the purposes of the CCTA and the CMSA.  City of New York v. Milhem Attea & Bros., Inc., 550 F. Supp. 2d 332, 346, 346 (E.D.N.Y. 2008) ("Milhem I") ("The plain, mandatory phrasing of the statute sets forth a requirement that stamping agents affix tax stamps to all cigarettes the state has the power to tax, which includes those sold by reservation retailers for re-sale to the public.").  Defendants moved for reconsideration, premised on Day Wholesale, Inc. v. State of New York, 51 A.D.3d 383 (4th Dep't 2008), which had held that the State's cigarette tax collection statute, Tax Law § 471-e, was not in effect.  The Court denied the motions for reconsideration, holding that the current enforceability of a provision governing tax collection did "not alter the scope of § 471 or its legal force."  City of New York v. Milhem Attea & Bros., Inc., 591 F. Supp. 2d 234, 237 (E.D.N.Y. 2008) ("Milhem II").

The Court did, however, dismiss the City's aiding and abetting claim under the CCTA. The City's complaint had alleged that CCTA violations occurred at two different points in the unstamped cigarette supply chain.  First, the City alleged that the defendants violated the CCTA by selling cigarettes to Native American retailers, knowing the cigarettes were destined for re-sale to the public, without affixing state tax stamps. Second, the City alleged that the Native

American retailers themselves violated the CCTA when they re-sold those cigarettes in sufficiently large quantities to non-tribal purchasers. The City sought to hold the wholesaler defendants responsible for both violations, the former under a theory of primary liability, and the latter under a theory of "aiding and abetting" liability. The Court dismissed the aiding and abetting claim based on its determination that "the CCTA does not provide for civil aiding and abetting liability." City of New York v. Milhelm Attea & Bros., Inc., 2009 WL 701005, at *2 (E.D.N.Y. March 11, 2009) ("Milhelm III").

The City has succeeded in settling with some defendants to this action, leaving only Gutlove, Pennisi, and Day. Since June 2011, when all the litigation surrounding the Tax Law Amendments concluded, it appears that none of these defendants have been engaged in the business of selling unstamped cigarettes, and the City is no longer seeking any injunctive relief against them. The City brought the instant motion seeking retrospective monetary relief pursuant to the CCTA, under three different theories: damages, civil penalties, or disgorgement of profits. At oral argument on February 24, 2012, the City withdrew its claim for damages and agreed only to pursue CCTA monetary relief on a civil penalty or disgorgement theory, based on the defendants' conduct post-dating this Court's April 30, 2008 order denying the defendants' motions to dismiss. (See Transcript of Oral Argument, Feb. 24, 2012, at 12.) The City is also maintaining a claim for attorneys' fees pursuant to its pendent CMSA claims.

The City's brings claims for relief based on conduct that occurred under both the pre- and post-amendment versions of § 471, however the majority of this opinion will address the pre-amendment version of the statute, which is the principal focus of the arguments on both sides.

**DISCUSSION**

**I.  STANDARD OF REVIEW**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>accord</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 23 (1986); <u>Belfi v. Prendergast</u>, 191 F.3d 129, 135 (2d Cir. 1999).  The Court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

The court is required to view the evidence in the light most favorable to the nonmoving party.  <u>See</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).  Nevertheless, the non-moving party cannot rest on mere allegations or denials but must instead set forth specific facts showing there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); <u>Nat'l Westminster Bank USA v. Ross</u>, 676 F. Supp. 48, 51 (S.D.N.Y. 1987) ("[S]peculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact.").  No genuine issue exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).

With these standards in mind, the Court turns to an analysis of the outstanding claims against the defendants.

**II.  STANDING**

At various points over the course of extended motion practice, the defendants have argued that the City lacks standing to maintain its claims against them.  These arguments have at

times been framed under Article III, and at times have seemed more grounded in statutory causation requirements, particularly as related to the City's now-withdrawn damages claim. Earlier in this litigation, the defendants' primary contention was that, because it is undisputed that the defendants had no duty to precollect <u>City</u> taxes during the relevant time period, their failure to precollect <u>state</u> taxes did not cause the City's alleged tax losses. Further, they argued "that even if they pre-collected the state tax of 15 dollars per carton, cigarettes sold by reservation retailers would still be 15 dollars cheaper outside of New York City because of the non-applicability of the City tax" and "the lost sales of which the City complains would continue to occur." <u>Milhelm I</u>, 550 F. Supp. 2d at 341. This Court rejected these arguments at the motion to dismiss stage, holding that the City had adequately demonstrated its Article III standing to bring suit. <u>Id.</u> at 340-41.

Since standing must be established "with the manner and degree of evidence required at the successive stages of the litigation," <u>Lujan</u>, 504 U.S. at 561, Pennisi and Day have suggested that the City has now failed to carry its burden on summary judgment that it has standing to pursue the defendants' CCTA and CMSA violations. (Pennisi Mem., DE #360, at 7-8; Day Mem., DE #378, at 12.) Moreover, Pennisi now argues that, at a minimum, there remain outstanding issues of fact regarding whether any Pennisi-sold cigarettes entered the City, and whether these cigarettes caused the City's injury by replacing sales on which a City tax would have been collected. (<u>Id.</u> at 8-12.) Day similarly presses the argument that the City has not presented evidence that any Day cigarettes actually made their way into the City, and thus the City lacks the requisite injury-in-fact to pursue relief against Day. (Day Mem., DE #378, at 12; Transcript of Oral Argument, Feb 24, 2012, at 38, 43.) Gutlove no longer appears to be pressing standing or causation arguments now that the City has withdrawn its claim for damages and is no

22

longer pursuing injunctive relief.  (Tr. at 15.)  The Court will address what it perceives to be the remaining standing arguments.

To establish constitutional standing under Article III, "a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision."  Denney v. Deutsche Bank AG, 443 F.3d 253, 263 (2d Cir.2006) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  Although "[i]njury in fact is a low threshold," Ross v. Bank of America, N.A., 524 F.3d 217, 222 (2d Cir. 2008), the claimed injury must nonetheless "be concrete and particularized as well as actual or imminent, not conjectural or hypothetical," Baur v. Veneman, 352 F.3d 625, 632 (2d Cir.2003).  However, a "plaintiff does not lack standing simply by virtue of the indirectness of his or her injury.  A plaintiff may satisfy the causation requirement if the complaint aver[s] the existence of [an] intermediate link between the [defendants' actions] and the injury."  Pacific Capital Bank, N.A. v. Connecticut, 542 F.3d 341, 350 (2d Cir. 2008) (internal quotation marks omitted).  As to redressability, only a "non-speculative likelihood that the injury can be remedied by the requested relief" must exist.  W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP, 549 F.3d 100, 106-07 (2d Cir. 2008).

Because there are significant differences in the City's evidence for Gutlove and Pennisi, and for Day Wholesale, the Court addresses the City's standing as to these defendants separately. Additionally, the Court's standing analysis is focused on the CCTA, as the City only seeks substantive relief under that statute, and the majority of the parties' arguments are concentrated on the claims under that statute.  However, many of the standing principles discussed below would apply equally to the City's pendent CMSA and public nuisance claims.

23

### A.  Gutlove and Pennisi

As to Gutlove and Pennisi, Court concludes that on the uncontroverted facts, the City has continued to demonstrate standing and has done so even more compellingly than at the motion to dismiss stage.  To begin with, the City has shown through a variety of evidence that these defendants' CCTA violations—their bulk sales of unstamped cigarettes to reservation retailers—caused it a concrete injury in the form of lost tax revenues.  As summarized above, the City has presented extensive evidence that unstamped cigarettes sold by those defendants were trafficked in large quantities into the City from Poospatuck Reservation for many years, without payment of City cigarette taxes.  As the City now points out, these cigarettes were subject to a City tax upon their very entry into the City—an issue that all the defendants decline to address.  See N.Y.C. Admin. Code § 11-1302(a) ("There is hereby imposed and shall be paid a tax on 1. All cigarettes possessed in the city for sale except as hereinafter provided; 2. The use of all cigarettes in the city except as hereinafter provided."); N.Y.C. Admin. Code § 11-1301(4) defining "use" as "Any exercise of a right or power, actual or constructive, [which] shall include but is not limited to the receipt, storage, or any keeping or retention for any length of time . . . .").  The City therefore need not prove that the particular transactions involving the defendants' cigarettes directly "replaced" transactions on which City taxes would have been collected.  This City was deprived of tax revenue to which it was entitled the minute the defendants' cigarettes were trafficked into City limits.  This lost tax revenue is clearly an injury sufficient for Article III purposes.[3]  The presence of cheap, untaxed cigarettes in the City also contributes to higher rates of smoking, thereby threatening the health of City residents, another cognizable injury.  (See Frieden Aff.)

---

[3] The Court need not address whether the City's evidentiary presentation would be sufficient to demonstrate an entitlement to a particular amount of damages on summary judgment.  The uncontroverted evidence is amply sufficient to demonstrate injury for standing purposes.

Moreover, the injury-in-fact inquiry "is gauged by the specific common-law, statutory or constitutional claims that a party presents." Fulton v. Goord, 591 F.3d 37, 41 (2d Cir. 2009) (quoting Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 77 (1991)). "The . . . injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'" Lujan, 504 U.S. at 578 (quoting Warth v. Seldin, 422 U.S. 490, 500 (1975)). The CCTA is expressly concerned with the flow of contraband cigarettes between jurisdictions with differing tax obligations, and the resulting deleterious effects on state and local tax collection. It prohibits actions taken with respect to contraband cigarettes at all stages of the distribution chain—shipping, transporting, receiving, possessing, selling, distributing and purchasing—and authorizes states and municipalities to bring actions to "prevent and restrain violations . . . by any person" and obtain "any other appropriate relief." 18 U.S.C. § 2346(b). The absence of any limiting language in this expansive grant of standing suggests that Congress intended to recognize a broad class of public injuries caused by the contraband cigarette market, and effectively to delegate enforcement authority to state and local governments—those whose tax revenues are most directly harmed. The City clearly has a legitimate interest in collecting its taxes, and the CCTA makes clear that the entry of contraband cigarettes into the City stream of commerce is a cognizable injury.

Turning to traceability, that there was an "intermediate link" (the reservation retailers) between these defendants' sales and the City's injury does not defeat the causation component of the standing inquiry. The defendants were the sources of the unstamped cigarettes on which the contraband market flowing from Poospatuck relied, and thus are properly considered causes of the resulting injury. See Bennett v. Spear, 520 U.S. 154, 168-69 (1997) ("[The Government] wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's

actions are the very last step in the chain of causation."); Heldman v. Sobol, 962 F.2d 148, 156

(2d Cir. 1992) (plaintiff satisfies the causation prong if it "allege[s] all the links in the chain of

causation," and the intermediary's actions were the "direct result" of the challenged conduct).

"While . . .  it does not suffice if the injury complained of is 'th[e] result [of] the independent

action of some third party not before the court,' that does not exclude injury produced by

determinative or coercive effect upon the action of someone else."  Bennett, 520 U.S. at 169

(quoting Lujan, 504 U.S. at 560-61) (emphasis in original).  The record in this case demonstrates

that the trafficking of untaxed cigarettes from Poospatuck into the City was entirely dependent

on Gutlove and Pennisi as the wholesale providers of those cigarettes.

　　　The fact that the defendants were not required to precollect City taxes during the period

at issue does not undermine the causal relationship between their sales of unstamped cigarettes

and the City's tax injury.  As an initial matter, it is worth noting that the defendants do not

appear to dispute that if they had sold and shipped cigarettes directly into the City, they would

have been required to precollect City taxes.  See Milhelm I, 550 F. Supp. 2d at 340 ("Pursuant to

. . . state legislation, the New York City Administrative Code requires stamping agents to affix

City tax stamps on cigarettes prior to delivery of those cigarettes to any dealer in New York

City.").  Here, they simply avoided any such municipal taxing obligations by flooding millions

of cartons of cigarettes into a small Native American reservation a short distance outside the

City.  More importantly, the unlawful market at issue here was premised on trafficking in tax-

free cigarettes—the Poospatuck bootlegging economy only existed because of the absence of any

tax payments on the cigarettes sold.  Cf. Colville, 447 U.S. at 157 ("[A]lthough the result of

these taxes will be to lessen or eliminate tribal commerce with nonmembers, that market existed

in the first place only because of a claimed exemption from these very taxes.").  The suggestion

that even if the defendants had abided by their state tax obligations the flow of cigarettes from Poospatuck into the City would have continued unabated is, if not contrary to facts and logic, at least the sort of "speculative and hypothetical possibilit[y]" that does not defeat Article III standing.  Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 78 (1978).  The Court thus concludes that the presence of unstamped cigarettes in the City is traceable to the defendants' CCTA violations.[4]

In the interest of completeness, the Court observes that the arguments revolving around causation may be better conceived not as Article III issues, but rather as raising the statutory question of whether the CCTA extends direct liability (as opposed to the previously rejected aiding and abetting liability[5]) to an action between parties in the positions presented here—that is, in an action brought by a city against defendants who transacted in cigarettes that were only "contraband" within the meaning of the CCTA because of a failure to affix state tax stamps. These matters relate to prudential doctrines of statutory standing, as well as to the intertwined question of statutory causation.

The Second Circuit has explained that in any "'suit on a statute'. . . the plaintiff must show both that he is within the class the statute sought to protect and that the harm done was one that the statute was meant to prevent."  Abrahams v. Young & Rubicam, Inc., 79 F.3d 234, 237 (2d Cir. 1996); see Lerner v. Fleet Bank, N.A., 459 F.3d 273, 284 (2d Cir. 2006).  This test contains a formulation of the "zone of interests" prudential standing inquiry—"whether the interest sought to be protected by the complainant is arguably within the zone of interests to be

---

[4] Pennisi's reliance on Judge Hurley's causation discussion in United States v. Morrison, 685 F. Supp. 2d 339 (E.D.N.Y. 2010) is misplaced.  There, the court considered whether the City was entitled to restitution under the particular standards applicable to the Mandatory Victims Restitution Act, and expressly distinguished the issue of civil liability for monetary relief under the CCTA.  Id. at 346.
[5] The Court does not believe that its decision in Milhelm III that there is no aiding and abetting liability under the CCTA forecloses the City's theory of direct liability presented here.  Milhelm III certainly expressed no view on that issue.

protected or regulated by the statute or constitutional guarantee in question." <u>Bennett v. Spear</u>, 520 U.S. 154, 162-63 (1997) (quoting <u>Association of Data Processing Serv. Orgs., Inc. v. Camp</u>, 397 U.S. 150, 153 (1970)); <u>see</u> <u>Lerner v. Fleet Bank, N.A.</u>, 318 F.3d 113, 121 n.6 (2d Cir. 2003) (noting that <u>Abrahams</u> test incorporates "zone of interests" test for statutory standing).  These requirements are also "frequently discussed in terms of causation," and may be intertwined with the merits of the cause of action, rather than purely jurisdictional.  <u>Abrahams</u>, 79 F.3d at 237; <u>Lerner</u>, 318 F.3d at 116-17.  Importantly, however, statutory liability may extend further than common law notions of proximate cause: "conceivably, some statutes might go beyond the common law and create rights of recovery for plaintiffs who are not foreseeable and who are injured by defendants' wrongdoing. A legislature could do so if it wished."  <u>Abrahams.</u>, 79 F.3d at 237 n.3.

Based on these principles, and the statutory language, the Court concludes that the CCTA authorizes claims such as those presented here.  Nothing in the statute or its legislative history suggests that its scope could not extend to situations where a municipality was harmed by a wholesaler defendant's failure to abide by the state's taxing obligations.  Indeed, by its plain terms, the statute authorizes states and municipalities to bring actions to prevent and restrain violations by "any person."  While the Court agrees that this statutory grant of standing could not eliminate the requirements of Article III, it would not appear to require anything more.  Where, as here, the City can show that the defendants' failure to affix state tax stamps "injected unstamped cigarettes directly into the New York State and City streams of commerce," ultimately depriving the City of valuable tax revenue, an action may be maintained against the CCTA violators that were fonts of that unlawful market.  <u>City of New York v. Chavez</u>, 2012 WL 1022283, at *5 (S.D.N.Y. 2012).

28

Finally, as to redressability, the Court recognizes that a plaintiff must demonstrate that the asserted injury could be likely redressed by "each form of relief sought." <u>Friends of the Earth, Inc. v. Laidlaw Environmental Servs., Inc.</u>, 528 U.S. 167, 185 (2000).  Because the City suffered a cognizable injury, which is fairly traceable to the defendants' sales of unstamped cigarettes, a sanction that "deter[s] future violations" and "prevents [the conduct's] recurrence provides a form of redress." <u>Id.</u> at 186.  As discussed further in the section on relief, civil penalties promote these objectives. <u>Id.</u> at 185-86, 188 (remedies, such as civil penalties, that encourage defendants to discontinue violations that were ongoing at the time of the complaint and that deter defendants from committing future violations can afford redress to injured plaintiffs).  And, of course, civil penalties will also provide some measure of compensation to the City for the past harms it has suffered.

In sum, the Court concludes that there are no genuinely disputed issues of material fact regarding the City's standing.  The City has put forth a substantial evidentiary showing that cigarettes attributable to Gutlove and Pennisi were trafficked into the City, thereby tangibly harming the City's own taxing schema and public health objectives.  Notably, Gutlove does not dispute that at least "some" of its unstamped cigarettes wound up in the City.  (Gutlove 56.1 Response, at ¶ 8.)  Based on the Court's analysis above, this admission implies an injury sufficient to confer standing on the City.[6]  Pennisi, meanwhile, offers only vague denials, conjecture, and unsupported attacks on the credibility of the City's evidence, without citing any facts or counter-evidence of its own.  (<u>See</u> Pennisi 56.1 Response, at ¶¶ 9-16.)  The Court

---

[6] To the extent that Gutlove has asserted in passing that it has not had an opportunity to conduct any depositions, it does  not appear that any of the defendants ever moved to lift the stay on depositions that was implemented by the magistrate judge in 2008, nor have they ever moved this Court for any depositions.  (<u>See</u> docket entry #161.)  Further, no defendant has submitted a declaration indicating what additional discovery is needed, what that discovery will show, and how it will create a genuine issue of material fact.  <u>See</u> Fed. R. Civ. P. 56(d); <u>Gurary v. Winehouse</u>, 190 F.3d 37, 43 (2d Cir. 2001).

concludes that on the present record any such claimed disputes of fact are not genuine.  Fed R. Civ. P. 56(a); <u>Crawford-El v. Britton</u>, 523 U.S. 574, 600 (1998) (once the moving party "has made a properly supported motion" for summary judgment, the non-movant "may not respond simply with general attacks upon . . . credibility, but rather must identify affirmative evidence" creating an issue of fact).[7]

Accordingly, the Court is satisfied that the City has met its burden on summary judgment to show that it has standing to pursue its claims against Gutlove and Pennisi.

## B.  Day Wholesale

As to Day Wholesale, the standing inquiry is more succinct:  the City's evidence has failed to bear out its assertion of a concrete injury-in-fact resulting from Day's cigarette sales. The City's only evidence on this motion that cigarettes sold by Day ever entered the City is that in 2008—over two years after this litigation commenced—a City investigator made controlled purchases of eight total cartons of cigarettes from websites operated by Scott Maybee, a Day customer who also purchased from multiple other cigarette wholesalers.  Aside from these controlled purchases, the City has failed to present any evidence that City residents ordered from Maybee-owned websites, or that cigarettes sold by Day to other Native American reservations ever entered the City.  The City does not, for example, present additional records of shipments from Maybee to City addresses, as it does in the case of Gutlove customer Peace Pipe Smoke Shop. It is also undisputed that during the relevant time frame, Day did not supply any cigarettes to the Poospatuck reservation, where the City has focused its investigation.  Although the Monell Affidavit might demonstrate that Maybee cigarettes were capable of entering the City, it does not

---

[7] Although Pennisi may legitimately challenge on the record before the Court the City's ability to demonstrate a specific amount of Pennisi cigarettes that were trafficked into the City, that challenge goes only to the claim for damages, which the City has withdrawn.  That some Pennisi cigarettes were trafficked into the City is not genuinely disputed.

suffice to show that those cigarettes actually entered and harmed the City in the ordinary course. At best, the City has shown the existence of two websites that City residents could have used, which were in the business of reselling cigarettes from a number of wholesale suppliers. Without some further evidence, the City's assertion that it was harmed by Day's activities remains only "conjectural or hypothetical." Baur, 352 F.3d at 632.

The Court also rejects the City's suggestion that the CCTA's reference to "civil penalties" somehow confers upon plaintiffs "bounty hunter" standing, apart from any other cognizable injury. (Pl. Reply at 42.) There is nothing to suggest that the CCTA creates a qui tam cause of action, or that plaintiff cities and states are acting as assignees of the federal government's injury. See Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 773 (2000) ("[A]n interest that is merely a 'byproduct' of the suit itself cannot give rise to a cognizable injury in fact for Article III standing purposes. . . . We believe, however, that adequate basis for the relator's suit for his bounty is to be found in the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor. The FCA can reasonably be regarded as effecting a partial assignment of the Government's damages claim."). And despite the broad remedial language of the CCTA, "[s]tatutes do not abdicate the standing requirements of the Constitution." Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 200 (2d Cir. 2005); see Raines v. Byrd, 521 U.S. 811, 820 n. 3 (1997) ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.").

The problematic nature of allowing the City to maintain this action against Day is demonstrated in the remedies requested. Despite the bare thread of a connection between the

City and Day's sales, the City's requested relief (civil penalties or disgorgement), by virtue of being tied to total sales of unstamped cigarettes, would be in the greatest amount from Day— simply because it ran the largest business, not because any of those cigarettes demonstrably harmed the City.  Of some note, the City has never attempted to obtain damages from Day, a fact which Corporation Counsel admitted was the result of the weakness of proof of Day cigarettes making it into City limits.  (Transcript of Oral Argument, at 34-35.)  Although the City's allegations towards the defendants as a group were sufficient to support standing at the motion to dismiss stage, the City simply has not demonstrated through competent evidence that it suffered an injury-in-fact as a result of Day's particular conduct.

Finally, the Court doubts that it is appropriate, in any event, to base the City's injury only on the 2008 controlled purchases themselves: a plaintiff generally cannot create an injury during the course of litigation in order retroactively to establish standing.  See Lujan, 504 U.S. at 569 n.4 (noting "longstanding rule that jurisdiction is to be assessed under the facts existing when the complaint is filed" and that "a plaintiff cannot retroactively create jurisdiction based on postcomplaint litigation conduct"); Riverkeeper, Inc. v. Mirant Lovett, LLC, 675 F. Supp. 2d 337, 352 (S.D.N.Y. 2009) ("courts assess whether standing exists based on the facts as they existed at the time the lawsuit was filed"); White v. First American Registry, 230 F.R.D. 365, 367 (S.D.N.Y. 2005) ("The requisite personal interest must exist at the commencement of the litigation").

Accordingly, the Court concludes that the City lacks standing to pursue its claims against Day Wholesale, and summary judgment is granted to Day.[8]  The remainder of this opinion will therefore address only defendants Gutlove and Pennisi.

---

[8] The Court's conclusion that the City lacks standing as to Day Wholesale, because it has not demonstrated an injury-in-fact resulting from Day's sales of unstamped cigarettes, is also grounds for

## III.  THE CCTA

### A.  Liability

The CCTA makes it "unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute or purchase contraband cigarettes."  18 U.S.C. § 2342(a).  Contraband cigarettes are defined as "a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes."  Id. § 2341(2).  "Together, these provisions establish four elements for a CCTA violation: that a party (1) knowingly 'ship, transport, receive, possess, sell, distribute or purchase' (2) more than 10,000 cigarettes (3) that do not bear tax stamps, (4) under circumstances where state or local cigarette tax law requires the cigarettes to bear such stamps."  Golden Feather, 2009 WL 2612345, at *26; see also Milhelm I, 550 F. Supp. 2d at 345-46.  As noted, in Milhelm I and II, the Court already held that § 471 constituted an "applicable" state tax that "require[d]" the affixation of tax stamps, with regards to cigarettes sold by the defendants to reservation retailers for re-sale to the public.  See Milhelm I, 550 F. Supp. 2d at 346-48; Milhelm II, 591 F. Supp. 2d at 238.

The CCTA's broad remedial provisions provide in relevant part that "[a] State, through its attorney general, or a local government, through its chief law enforcement officer . . . may bring an action in the United States district courts to prevent and restrain violations of this chapter by any person" and that in such an action, the plaintiff state or municipality may "also

---

granting summary judgment to Day on the City's pendent CMSA and public nuisance claims. See N.Y. Tax L. § 484(b) (civil action under CMSA may only be instituted by the Tax Commission or a "person injured by any violation or threatened violation"); New York Trap Rock Corp. v. Town of Clarkston, 299 N.Y. 77, 83 (1949) (municipal corporation may "bring an action to restrain a public nuisance which allegedly has injured the health of its citizens").

obtain any other appropriate relief for violations of this chapter from any person (or by any person controlling such person), including civil penalties, money damages, and injunctive or other equitable relief," in addition to "any other remedies under Federal, State, local, or other law."  18 U.S.C. § 2346 (b).

It is undisputed that the defendants have sold and shipped vast quantities of unstamped cigarettes to reservation retailers since prior to this litigation, and continuing after the September 1, 2010 effective date of the Taw Law Amendments.  On this motion, the defendants make various arguments for why they were not "require[d]" to place state tax stamps on the cigarettes at issue (the fourth element of a CCTA violation), and also argue that the City has not shown that they possessed the requisite scienter.  In particular, one or more of the remaining defendants argues that:  (1) state law did not require them to affix tax stamps to the cigarettes they sold to reservation retailers; (2) they are exempted from CCTA liability under 18 U.S.C. § 2341(2)(C) because they have complied with state accounting and payment requirements for their stamping licenses; (3) they are exempted from § 471 tax liability under the New York Code of Rules and Regulations; (4) the City has not adequately demonstrated that they acted "knowingly" under the CCTA; and (5) the defendants cannot be held liable for cigarette sales that occurred during the stays of the Tax Law Amendments.  The Court will address each of these arguments in turn.

1.   The Applicability of § 471's Stamping Requirement

 The defendants continue to argue that they were not obligated under the prior version of § 471 to affix tax stamps to any of the cigarettes they sold to reservation retailers. In particular, they argue that the Cayuga decision undermines this Court's holdings that § 471 required the defendants to precollect taxes on the bulk quantities of cigarettes they sold to reservation retailers for resale to the public.  This Court already rejected a Cayuga-based argument in upholding the

34

preliminary injunction against the reservation retailers in the <u>Golden Feather</u> case.  Moreover, the Second Circuit's recent pronouncements in <u>Morrison</u> foreclose many of the defendants' arguments premised on <u>Cayuga</u> or the DTF forbearance policy.

As an initial matter, <u>Cayuga</u> clearly establishes that pre-amendment § 471 did impose a tax on reservation sales to non-Native Americans, and that the reservation retailers were not complying with that requirement.  <u>Cayuga</u> held only that criminal prosecution of the reservation retailers was not permissible under the circumstances presented, not that tax stamps were not required on reservation sales to non-Native Americans.  <u>See</u> <u>Cayuga</u>, 14 N.Y. 3d at 647 ("Indian retailers cannot be criminally prosecuted for non-compliance with the laws governing sales taxes."); <u>id.</u> at 647-48 ("sales taxes are due when non-Indian consumers purchase cigarettes form Indian retailers"); <u>see also</u> <u>Morrison</u>, 2012 WL 2877648, at *6, *10 (regarding on-reservation cigarette sales to non-Native Americans: "New York had the power to impose [a] tax and state law mandated that the tax be paid").  <u>Cayuga</u> therefore does not undermine the conclusion that § 471 imposes an applicable tax and stamping requirement for CCTA purposes where the cigarettes are intended for resale to the public.  Moreover, <u>Cayuga</u> expressly stated that it was permissible to enforce § 471 against parties engaged in "large-scale" distribution of untaxed cigarettes "destined for" non-Native American consumers, <u>Cayuga</u>, 14 N.Y. 3d at 652-53, an exception that reasonably covers the conduct at issue here.

The defendants' efforts to distinguish their position as wholesalers and to argue that § 471 still cannot be enforced against them under <u>Cayuga</u> are unpersuasive.  The defendants argue that despite the general applicability of § 471 to reservation sales to non-Native Americans, <u>Cayuga</u> nonetheless made clear that the applicable tax could not be collected from reservation retailers under the circumstances, and therefore it must follow that the defendants'

sales to those retailers were not required to bear tax stamps.  Under <u>Cayuga</u>, the argument goes, the § 471 tax could only be collected directly from the consumer, via the "use tax" in § 471-a. This position implies that wholesalers who sold to reservation retailers were even less responsible for collecting the tax, because there was no mechanism in place for wholesalers to determine how many taxed and untaxed (stamped and unstamped) cigarettes they could legally supply to Native American retailers, given that they had little if any control over whom those retailers would ultimately sell to.  Put differently, it appears to be the defendants' contention that as long as one can assume that at least "a single pack" of their cigarettes was ultimately sold to a reservation Native American, then <u>Cayuga</u> shields all their sales from § 471.  <u>See Cayuga</u>, 14 N.Y.3d at 653.

This line of argument fails for several reasons.  First, <u>Cayuga</u> expressly allowed for the enforcement of § 471 in cases where "a <u>wholesaler or distributor</u>, whether Indian or otherwise, makes a bulk sale of cigarettes to a party that intends to resell them off the reservation," noting that "there is no exemption allowing . . . [for] the wholesale distribution of untaxed cigarettes <u>destined for</u> off-reservation sales."  14 N.Y.3d at 653 (emphasis added).  Thus, the N.Y. Court of Appeals made clear that even those entities at the start of the cigarette distribution chain could be held liable for the tax—at least where the wholesaler had knowledge that the cigarettes were "destined for" non-Native American consumers.

Second, the fact that the tax in these transactions could have been collected from the ultimate consumer does not eliminate liability for the prior parties in the distribution chain.  All cigarette transactions, even outside the Native American context, are subject to the backstop "use tax" in § 471-a; in no other scenario does that provision eliminate the responsibility of wholesalers and retailers to precollect the tax and to sell cigarettes displaying the requisite stamp.

See Morrison, 2012 WL 2877648, at *4 ("Since the State had not enacted a regulation that would permit the [DTF] to collect taxes without use the tax stamp mechanism, all cigarettes that New York had the power to tax had to be stamped."); N.Y. Tax L. § 471(2).

Third, the defendants operate as stamping agents through the grace of a state-issued license. State regulations provide that a stamping agent is at all times "responsible for the honest and expeditious payment and collection of the cigarette tax." 20 N.Y.C.R.R. §71.1. The defendants have no general right to employ their state-issued licenses as they see fit, or to operate without the burdens and interference of state taxes. If the defendants found it impossible to sell cigarettes to Native American reservations in way that distinguished between taxable and tax-exempt consumer transactions, they need not have engaged in that market at all and certainly need not have supplied reservation retailers with unlimited quantities of unstamped cigarettes.

Fourth, it is the defendants burden to establish non-taxability under § 471, which states: "It shall be presumed that all cigarettes within the state are subject to tax until the contrary is established, and the burden of proof that any cigarettes are not taxable hereunder shall be upon the person in possession thereof." As this Court explained in Golden Feather:

> Defendants have not presented evidence that any of the cigarettes they . . . sell are intended for . . . Tribe members for their own consumption. Accordingly, on the record in this case, all of the cigarettes defendants deal in are subject to tax. Defendants cannot defeat CCTA liability for [selling] massive quantities of untaxed cigarettes intended for resale to non-Tribe members based upon the hypothetical possibility, unsupported in the record, that some portion of those cigarettes [were] sold to Tribe members for their own consumption. Such cigarettes are contraband from the moment defendants [ship, transport, sell, or distribute] them in quantities greater than 10,000 cigarettes, unless defendants carry their burden of proving that any such cigarettes are not taxable. Defendants have not met that burden.

Golden Feather, 2009 WL 2612345 at *35. Gutlove and Pennisi have made no attempt to present actual evidence that any of the cigarettes they sold to reservation retailers were in fact

resold to Native American consumers and are thus tax-exempt, or that they had any belief that such was the case. Indeed, the sheer volume of their sales refutes any such belief. Thus, they have not rebutted the presumption that all their sales were subject to state taxes.

Finally, and most concretely, the facts presented in this case make the defendants' protestations ring hollow. The defendants are in essence urging that because there was no prescribed tax collection mechanism for reservation cigarette sales, they had no option but to sell millions upon millions of unstamped cigarettes to retailers on the 375-person Poospatuck reservation—incidentally, at a large profit to themselves. Neither Gutlove nor Pennisi ever made any attempt to control or restrict the volume of unstamped cigarettes they sold to reservation retailers, or even to make inquiry of their customers about cigarette consumption by reservation Native Americans. The defendants' actions were thus materially indistinguishable from selling bulk quantities of unstamped cigarettes directly to members of the public. That the defendants funneled those cigarettes through the enforcement loophole presented by Native American reservation retailers does not insulate them from liability. Although the Court does not foreclose the possibility that there might exist fact patterns that would bar liability in the face of a wholesaler's good faith attempts to comply with its tax obligations under the prior version of § 471, this case does not present such a scenario. Cf. Morrison, 2012 WL 2877648, at *10 ("To the extent that New York's forbearance policy might be said to create some ambiguity regarding the scope of Native American cigarette retailers' tax liability for on-reservation cigarette sales, Morrison's actions went far beyond the sort of conduct that might be in any area of ambiguity."). The Cayuga court expressly noted that liability under the state tax laws remained for bulk transactions in unstamped cigarettes plainly intended for resale to non-Native Americans. Moreover, Morrison affirmed that the CCTA was an appropriate tool for overcoming New

York's particular state-level obstacles to collecting applicable taxes on reservation-based cigarette sales.  Morrison, 2012 WL 2877648, at *11.

Accordingly, the Court rejects the defendants' arguments that § 471's taxing and stamping requirements did not apply to the cigarette sales at issue in this case.

> 2.   Compliance with Requirements of 18 U.S.C. § 2341(2)(C)

The defendants argue that pursuant to 18 U.S.C. § 2341(2)(C), the CCTA does not apply to entities such as themselves who are licensed to pay cigarette taxes by the state, and who have complied with all State accounting and payment requirements for the cigarettes involved.  The CCTA provides that the term "contraband cigarettes" does not apply to cigarettes "in the possession of":

> (C) a person--
> (i) who is licensed or otherwise authorized by the State where the cigarettes are found to account for and pay cigarette taxes imposed by such State; and
>
> (ii) who has complied with the accounting and payment requirements relating to such license or authorization with respect to the cigarettes involved; or

The defendants employ this provision in order to reiterate their arguments that they are shielded from liability because they reported all their sales of unstamped cigarettes to DTF, which had a policy of non-enforcement with respect to sales of unstamped cigarettes to and from reservation retailers.  It is certainly questionable whether the defendants complied with the "payment requirements" of their licenses "with respect to" their bulk sales of unstamped cigarettes, but their argument misses a simpler mark.  Although it is true that, under the CCTA, a licensed stamping agent may possess unstamped cigarettes, the terms of 18 U.S.C. §2341(2)(C) apply only to possession, not the other acts prohibited by the CCTA and relevant to this case, including shipment, transport, sale, or distribution.  18 U.S.C. § 2342(a).  This interpretation makes

common sense.  A manufacturer or licensed stamping agent would of course possess unstamped cigarettes before completing its function: stamping the cigarettes, and distributing those properly stamped cigarettes to retailers.  The City has not claimed that the defendants violated the law when the unstamped cigarettes were merely sitting in their warehouses; the City's claims are predicated on the point at which the defendants ultimately distributed those cigarettes to retailers for resale to the public.  Indeed, it would be almost nonsensical for the CCTA to create a broad safe-harbor for state-licensed stamping agents to distribute large quantities of untaxed cigarettes in violation of state law.  Accordingly, the Court concludes that the defendants' conduct is not protected by § 2341(2)(C).

3.  <u>Compliance with State Regulations:  20 N.Y.C.R.R. § 76.1</u>

Gutlove and Pennisi argue that they are not liable under the CCTA because they are in compliance with the New York Code of Rules and Regulations.  Specifically, they argue that 20 N.Y.C.R.R. § 76.1 exempts their sales of unstamped cigarettes from liability under § 471.  Section 76.1 provides in relevant part:

> (d)(1) A seller of cigarettes who, at or prior to the delivery of such cigarettes, in good faith accepts from the purchaser a properly completed exemption certificate or other document evidencing an exemption from tax or a purchase for resale to exempt purchasers, is relieved of the liability for failure to have prepaid and precollected the cigarette tax with respect to that transaction and the burden of proving that such sale of cigarettes is not subject to tax is solely on the purchaser.

> (2) (i) A certificate or other document is accepted in good faith when a seller of cigarettes has no actual knowledge that the exemption certificate or other document issued by the purchaser is false or is fraudulently presented.

In support of this argument, Gutlove and Pennisi submit "Certificates of Individual Exemption from State Taxes on Property or Services Delivered on a Reservation" (Form DTF-801), as well as tribal business licenses issued by the Unkechauge Nation.  (<u>See</u> Steven Sussner Aff., Nov. 3,

40

2010, ¶¶ 2-3, Ex. A; Sussner Supp. Aff., Dec. 6, 2010, Exs. A-C, E, F; Joseph Pennisi Aff., Nov. 4, 2010, ¶¶ 12, 22, Ex. G.)

As an initial matter, § 76.1 makes clear that it is not to be construed as "authorizing the sale or purchase of cigarettes upon which the seller has not prepaid and precollected the cigarette tax for any purpose other than for the proper administration of the exemptions from the cigarette tax imposed pursuant to article 20 of the Tax Law." 20 N.Y.C.R.R. § 76.1(b)(2)(iv).  Thus, the Court does not believe that the regulation insulates from liability the defendants' bulk transactions in unstamped cigarettes clearly intended for resale to non-exempt consumers.

Moreover, the documents submitted by Gutlove and Pennisi are not "properly completed" on their face.  The DTF-801 forms are entitled "Certificate of <u>Individual</u> Indian Exemption from State Taxes."   In bold lettering, immediately beneath the title, the DTF-801 states: "This certificate may not be used to purchase property or services for resale."  The back of the Exemption Certificate provides: "This exemption certificate, DTF-801, may only be used by an Indian who, … is purchasing such items for personal use and not for resale."  (<u>See</u> Proshansky Decl., Ex. 10.)  Notwithstanding these clear disclaimers, many of the DTF-801s submitted by the defendants are improperly filled out in the name of stores, which are clearly purchasing the cigarettes for resale.  Additionally, the entities to which Gutlove and Pennisi sold unstamped cigarettes purchased in such volume that it is inconceivable that these sales were of "items for personal use and not for resale."

Accordingly, the Court concludes that the defendants are unable to demonstrate that their conduct was insulated from tax liability by 20 N.Y.C.R.R. § 76.1.

4.  <u>Scienter</u>

Pennisi argues that because the CCTA prohibits "<u>knowingly</u> to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes," 18 U.S.C. § 2342(a), the City must show that the defendants knew that the cigarettes they sold were "contraband," <u>i.e.</u>, were required to bear tax stamps under state law.  Pennisi contends that the City cannot make such a showing in light of the alleged ambiguity of the prior tax laws and the DTF forbearance policy.  <u>See</u> <u>Milhelm I</u>, 550 F. Supp. 2d at 337-38.

In <u>Morrison</u>, the Second Circuit noted that the defendant had argued on appeal "that a valid conviction under the CCTA required the government to show that [he] had knowledge that he was selling 'contraband' cigarettes."  <u>Morrison</u>, 2012 WL 2877648, at *12.  The court summarily found this argument "meritless . . . essentially for the reasons" given by the district court.  <u>Id.</u>  The district court had held, as a matter of statutory interpretation, that the CCTA does not require proof that the defendant knew his conduct violated the law, <u>United States v. Morrison</u>, 2007 WL 3274697 3274697, at *2 n.1 (E.D.N.Y. 2007), and had also rejected the defendant's claim that due process imposed such a heightened mens rea requirement, <u>United States v. Morrison</u>, 596 F. Supp. 2d 661, 700 (E.D.N.Y. 2009).  In the latter instance, the district court observed that no elevated scienter element was required because the terms of § 471 were "quite simple: All cigarettes sold on a reservation to non-Native Americans must be stamped." <u>Id.</u> at 701; <u>see also</u> <u>id.</u> at 705 ("[T]here is no ambiguity in the language of the CCTA and what it proscribes. Thus, there are no vagueness concerns and the lack of an elevated mens rea, in and of itself, does not render the statute unconstitutional.").

Several courts in other circuits have also held that a CCTA violation does not require proof that the defendant knew the cigarettes he possessed, distributed or sold were required by

law to bear tax stamps.  See United States v. Elshenawy, 801 F.2d 856, 857-59 (6th Cir. 1986)

(holding that criminal conviction under CCTA does not require proof "that the defendant knew

that payment of state cigarette taxes was required"); United States v. Baker, 63 F.3d 1478, 1491-

93 (9th Cir. 1995) ("We conclude conviction under the CCTA does not require proof that a

defendant knows his conduct violates the law."); United States v. Mahoney, 298 Fed. App'x.

555, 557 (9th Cir. 2008) (same); United States v. Funds from First Regional Bank Account

#XXXXX1859, 639 F. Supp. 2d 1203,1213-14 (W.D. Wash. 2009).  These courts have held that

all that is required under the CCTA is that the defendant knew "the physical nature of what he

possessed," i.e., cigarettes without stamps, Elshenawy, 801 F.2d at 859, not "that the actions

engaged in violate the law."  Baker, 63 F.3d at 1491; Funds from First Regional, 639 F. Supp. 2d

at 1213-14 ("Because there is no dispute that Global knew that it was shipping unstamped

cigarettes to Washington …, it acted willfully regardless of whether it also knew the legal

consequences of such conduct.").

  The defendants here do not dispute that they sold and shipped unstamped cigarettes in

CCTA quantities that vastly exceeded any plausible Native American consumption.  Guided by

Morrison, and the holdings of every other court to have considered the question, this Court thus

concludes that the CCTA does not require further proof that the defendants knew that their

conduct was unlawful under § 471 and the CCTA.

### 5.   Effect of the Tax Law Amendment Stays

  Although most of the defendants' conduct at issue occurred under the prior version of §

471, the City also claims that it is entitled to relief based on the defendants' continued sales of

unstamped cigarettes starting from September 1, 2010 (when the Tax Law Amendments became

effective) until around June 21, 2011, by which point the defendants had stopped selling

unstamped cigarettes.  The defendants argue, however, that they cannot be liable for sales of unstamped cigarettes between September 2010 and June 2011 due to the court-issued stays of enforcement of the Tax Law Amendments.

The primary federal court stay at issue here is the one issued by the district court in the Western District of New York.  There, although denying preliminary injunctions, the district court did stay "enforcement of the New York tax law amendments pending appeal."  Seneca Stay, 2010 WL 4027795, at *4; Unkechauge, 752 F. Supp. 2d at 328.  Although the District Court for the Northern District of New York also enjoined enforcement of "New York's cigarette taxing statutes and regulations," that order only applied to the Oneida Nation and its suppliers, and is thus not implicated for Gutlove or Pennisi and their sales to Poospatuck reservation. Oneida Nation of N.Y. v. Paterson, 2010 WL 4053080, at *13.  These orders remained in place until the denial of the Western District injunctions was affirmed, and the Northern District injunction was vacated, in May 2011. Oneida, 645 F.3d at 175-76.

Additionally, the defendants point to the TRO issued on May 20, 2011 in New York State Supreme Court, which enjoined "implementation and enforcement" of the Tax Law Amendments.  See Seneca Nation of Indians v. New York, 2011 WL 2436815, at *1 (N.Y. Sup. Ct. 2011).  On June 8, 2011, the court denied the Seneca Nation's request for a preliminary injunction and lifted the TRO.  Id. at *5.  The Fourth Department reissued a TRO which was lifted on June 21, 2011.  Seneca Nation of Indians v. State of New York et al., CA 11-01193, slip op. at 1 (4th Dep't June 21, 2011).

Even if these stays could permissibly preclude civil liability premised on the amended tax laws for acts committed during the stays' pendency, but see Edgar v. MITE Corp., 457 U.S. 624, 648-49 (Stevens, J., concurring in part and concurring in judgment), they did not repeal the prior,

existing version of § 471, which this Court has held was sufficient to impose a stamping requirement on the defendants' sales at issue.  This Court has consistently held that the absence of a statutory "collection mechanism" does not affect the applicability of the general tax imposed by § 471.  Accordingly, a stay of enforcement of the amended collection mechanism could not remove this tax liability.  Indeed, Judge Arcara specifically stated that the stay was meant to "preserve the status quo," Seneca Stay, 2010 WL 4027795, at *3, which, under the law of this case, included a tax on reservation sales to non-Native Americans that was sufficient to trigger liability under the CCTA and CMSA.

Accordingly, the Court rejects the defendants' contention that the stays of enforcement insulated their conduct from liability in the period from September 2010 through June 2011.

6.  Conclusion

For the reasons stated, and based on the uncontroverted evidence submitted by the City, the Court concludes that there are no outstanding issues of fact as to whether Gutlove and Pennisi violated the CCTA.  On the issue of these defendants' liability, summary judgment is granted to the City.

**B.  Relief**

Although the Court has concluded that the City has established Gutlove and Pennisi's liability under the CCTA, there remains the question of whether the City has requested "appropriate relief" in this case.  As indicated, the City is no longer pursuing injunctive relief against the defendants, in light of the Tax Law Amendments and what appears to be the defendants' voluntary cessation of all sales of unstamped cigarettes.  The City's current motion originally sought damages from Gutlove and Pennisi under the CCTA, in the form of lost City tax revenues on cigarettes trafficked from Poospatuck into the City.  In the alternative, the City

requested either civil penalties or disgorgement of profits. At oral argument, the City withdrew

its claim for damages, and pushed primarily for civil penalties or disgorgement, based on the

defendants' sales post-dating the motion to dismiss. Accordingly, the Court does not consider to

what extent the City would be entitled to damages under the CCTA on the facts presented here.

        For the reasons stated below, the Court concludes that an award of civil penalties to the

City is appropriate as against Gutlove and Pennisi. The Court will, however, hold a hearing and

allow both sides to be heard further on the appropriate penalty amount from each defendant.

        1.  <u>Civil Penalties</u>

        The CCTA authorizes municipalities bringing a civil action to "obtain any other

appropriate relief for violations of this chapter from any person . . ., including civil penalties."

18 U.S.C. § 2346(b)(2). Somewhat curiously, however, the CCTA does not specify a penalty

amount for violations of its core prohibition on transacting in contraband cigarettes. <u>Compare</u> 18

U.S.C. § 2346 <u>with, e.g.</u>, 18 U.S.C. § 35, § 216, § 229A, § 248, § 924, § 1034, § 1083, § 1716E,

§ 1956. A different provision of the CCTA does provide for a civil penalty amount, but only as

relates to failing to comply with inspections by federal officers from the Bureau of Alcohol,

Tobacco, Firearms, and Explosives. <u>See</u> 18 U.S.C. § 2343(c)(3) ("Whoever denies access to an

officer under paragraph (1), or who fails to comply with an order issued under paragraph (2),

shall be subject to a civil penalty in an amount not to exceed $10,000."). The parties and the

Court have not been able to locate any legislative history to the 2006 amendments to the CCTA

that sheds light on this omission. <u>See</u> USA Patriot Improvement and Reauthorization Act of

2005, Pub. L. No. 109-177, 120 Stat. 192, sec. 121; 151 Cong. Rec. H. 6273, 6284 (daily ed. July

21, 2005) (statements of Reps. Coble, Sesenbrenner, Cantor, and Kildee); H.R. Rep. 109-174

(July 18, 2005). The City suggests that the Court "borrow" a penalty amount from the Prevent

All Cigarette Trafficking ("PACT") Act of 2010, 15 U.S.C. § 375 et. seq., which contains similar provisions and was motivated by similar concerns.

The defendants' primary argument against civil penalties is that the provision of the CCTA allowing for such an award, without providing a maximum dollar amount or factors to guide a court's discretion, violates due process.  Pennisi does not cite any legal authority for this position.  Gutlove relies on BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996) for the proposition that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."  Id. at 574.  The Court is not persuaded by the defendants' arguments.

To begin with, Gore held that due process requires a trial court to set aside or remit a jury's award of punitive damages that can be characterized as "grossly excessive" when considered in light of "the degree of reprehensibility of [the defendant's conduct]; the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases."  Id. at 575; see also DiSorbo v. Hoy, 343 F.3d 172, 186 (2d Cir. 2003) (punitive damages award is excessive under Gore, and must be remitted or set aside, where "the award is so high as to shock the judicial conscience").  The case does not hold, for example, that a defendant must have advance notice of a precise upper limit on punitive damages, and says nothing at all about judicially imposed civil penalties.  See TXO Production Corp. v. Alliance Res. Corp., 509 U.S. 443, 463-66 (1993) (rejecting due process challenge based on assertion that the defendant "had no advance notice that the jury might be allowed to return such a large [punitive damages] award," because "prior law fairly indicated that a punitive damages award

might  be imposed" in such circumstances).  Indeed, the Supreme Court made clear that the

"strict constitutional safeguards afforded to criminal defendants" have less force in civil cases,

and the imposition of civil penalties implicates only "the basic protection against 'judgments

without notice' afforded by the Due Process Clause."  Gore, 517 U.S. at 574 n.22.  The

defendants have therefore failed to cite any authority indicating why it would violate due process

for a federal statute to allow for civil penalties without prescribing a particular dollar range.[9]

Moreover, based on the Court's own review of the case law, it concludes that an award of

civil penalties under the CCTA would not be unconstitutional or otherwise problematic in this

case.

Civil penalties can serve "as a rough form of liquidated damages" for the public harms

caused by the defendant's conduct.  United States v. Ursery, 518 U.S. 267, 283-84 (1996).  They

are also, however, designed in some measure "to punish culpable individuals," and not "simply

to extract compensation or restore the status quo."  Tull v. United States, 481 U.S. 412, 422

(1987); see Johnson v. S.E.C., 87 F.3d 484, 492 (D.C. Cir. 1996) ("[T]he ordinary,

contemporary, common meaning of the word 'penalty,' [is] a sanction imposed by the

government for unlawful or proscribed conduct which goes beyond remedying the damage

caused to the harmed party.").  Civil penalties also serve the purposes of "encourag[ing]

defendants to discontinue current violations and deter[ring] them from committing future ones."

Friends of the Earth, 528 U.S. at 186; see also Hudson v. United States, 522 U.S. 93, 102 (1997)

("[A]ll civil penalties have some deterrent effect."); SEC v. Haligiannis, 470 F.Supp.2d 373, 386

---

[9] Of course, given the Second Circuit's recent rejection of a vagueness challenge to § 471, the defendants here cannot contend that they lacked requisite notice that their conduct was prohibited under the statute. See Morrison, 2012 WL 2877648, at *6-9; County of Suffolk v. First American Real Estate Solutions, 261 F.3d 179, 195 (2d Cir. 2001) ("Due process requires that before a criminal sanction or significant civil or administrative penalty attaches, an individual must have fair warning of the conduct prohibited by the statute or the regulation that makes such a sanction possible.").

(S.D.N.Y.2007) ("Civil penalties are designed to punish the individual violator and deter future violations . . .").

It is true that civil penalty provisions in federal statutes typically contain an upper cap on penalties (e.g., penalties "up to" or "not to exceed" a certain amount), and sometimes enumerate a list of factors that a court should consider in selecting a penalty amount out of the available range.  See generally United States v. Complex Machine Works Co., 83 F. Supp. 2d 1307, 1312-15 (C.I.T. 1999) (surveying various federal civil penalty provisions).  However, it is worth noting that while the CCTA is certainly a rare example of a statute allowing for civil penalties but omitting any specific guidance to the court imposing them, it does not appear to be the only one.  For example, a provision in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which regulates the conduct of "debt relief agencies," allows for the court "on its own motion or on the motion of the United States trustee or the debtor" to "impose an appropriate civil penalty" if the court "finds that a person intentionally violated this section, or engaged in a clear and consistent pattern or practice of violating this section."  11 U.S.C. § 526(c)(5)(B); see Milavetz, Gallop & Milavetz, P.A. v. United States, 130 S. Ct. 1324, 1335 (2010) ("Among the actions authorized [by the BAPCPA], a debtor may sue . . . for remittal of fees, actual damages, and reasonable attorney's fees and costs; a state attorney general may sue for a resident's actual damages; and a court finding intentional abuse may impose an appropriate civil penalty."); In re Wicker, 2012 WL 580481, at *3 (E.D. Mich. 2012) (noting that "Section 526(c)(5) permits the court to fashion an appropriate civil remedy for violations found to be intentional" and finding $5,000 penalty imposed was not an abuse of discretion).  The statute does not prescribe a penalty amount or range.

Moreover, the Court is not aware of any authority indicating that it would be impermissible for Congress to allow for the imposition of civil penalties without prescribing a certain range or limit.   Rather, cases discussing civil penalties suggest the contrary conclusion. For example, in Tull, the Supreme Court held that the assessment of civil penalties by a trial judge does not infringe the Seventh Amendment right to a jury trial, observing that the determination of civil penalties was a matter properly committed to the discretion of the court:

> Since Congress itself may fix the civil penalties, it may delegate that determination to trial judges. In this case, highly discretionary calculations that take into account multiple factors are necessary in order to set civil penalties under the Clean Water Act. These are the kinds of calculations traditionally performed by judges.

Tull, 481 U.S. at 427; see also Standard Oil Co. of Indiana v. Missouri, 224 U.S. 270, 285-88 (1912) ("Nor, from a Federal standpoint, is there any invalidity in the judgment because there was no statute fixing a maximum penalty . . . . [C]onsidering the fine as in the nature of a civil penalty, the case is within the principle which permits the recovery of punitive damages.").

Indeed, even where the statute provides guidance, the Second Circuit has noted that there are an "enormous range of penalties available to the district court in the usual civil penalty case." United States v. J.B. Williams Co., Inc., 498 F.2d 414, 439 (2d Cir. 1974).  Accordingly, courts have developed doctrines for guiding the discretion of trial judges in imposing civil penalties, where little guidance is provided by the governing statute.  The Second Circuit has directed that, where the statute does not mandate consideration of any particular factors, "[a] district court may properly consider a number of factors in determining the size of a civil penalty, including the good or bad faith of the defendants, the injury to the public, and the defendants' ability to pay." Advance Pharmaceuticals, Inc. v. United States, 391 F.3d 377, 399 (2d Cir. 2004).  For example in securities actions, where the governing statutes provide only that the court should determine

the civil penalty (not to exceed an upper limit) "in light of the facts and circumstances," courts in

this circuit have looked to:

> (1) the egregiousness of the defendants conduct; (2) the degree of the defendants
> scienter; (3) whether the defendants conduct created substantial losses or the risk
> of substantial losses to other persons; (4) whether the defendants conduct was
> isolated or recurrent; and (5) whether the penalty should be reduced due to the
> defendants demonstrated current and future financial condition.

S.E.C. v. Pentagon Capital Management PLC, 2012 WL 1036087, at *2 (S.D.N.Y. 2012)

(quoting SEC v. Haligiannis, 470 F.Supp.2d 373, 386 (S.D.N.Y.2007)); see also F.E.C. v.

Furgatch, 869 F.2d 1256, 1258 (9th Cir. 1989) (taking "guidance from cases that deal with the

imposition of discretionary civil penalties under other federal statutes" in assessing civil

penalties under the Federal Election Campaign Act); Morse Diesel International, Inc. v. United

States, 79 Fed. Cl. 116, 124 (Ct. Fed. Cl. 2007) (surveying cases and methods for calculating

civil penalties under the False Claims Act); Complex Machine Works, 83 F. Supp. 2d at 1315

(listing fourteen possible factors from other statues relevant to determination of civil penalties

under the Customs Reform Act).  Given the wide degree of discretion often afforded to district

courts to impose civil penalties within certain broad ranges, and the longstanding judicial

doctrines to guide that discretion, the mere fact that the CCTA omits a penalty cap is not itself

problematic.

 Rather, given the CCTA's clear and express authorization for a plaintiff state or

municipality to obtain civil penalties, the Court must "assume . . . that Congress legislated

against a background of law already in place and the historical development of that law," and

that the civil penalties authorized by the CCTA should be guided by existing judicial doctrines

and comparable cases and statutes.  Garcia v. Teitler, 443 F.3d 202, 207 (2d Cir. 2006); see

National Archives and Records Admin. v. Favish, 541 U.S. 157, 169 (2004) ("We can assume

Congress legislated against this background of law, scholarship, and history when it enacted

FOIA and when it amended Exemption 7(C) to extend its terms."); Morissette v. United States,

342 U.S. 246, 263 (1952) ("[W]here Congress borrows terms of art in which are accumulated the

legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster

of ideas that were attached to each borrowed word in the body of learning from which it was

taken and the meaning its use will convey to the judicial mind unless otherwise instructed.").

    Accordingly, the Court concludes that the "basic [due process] protection against

judgments without notice" is adequately safeguarded by the express terms of the CCTA and the

surrounding judicial doctrines governing civil penalties.  Moreover, to the extent that Gore and

the Supreme Court's punitive damages doctrines are applicable here, due process will not be

offended by the imposition of civil penalties in these circumstances, at least so long as the Court

ensures that they are commensurate with "the degree of [the defendants'] reprehensibility,"[10]

reflect a reasonable relationship to "the harm or potential harm" caused by the defendants, and

are proportional to "the civil penalties authorized or imposed in comparable cases."  Gore, 517

U.S. at 575.

    The Court does not believe that the issue should necessarily be disposed of by a

wholesale "borrowing" of civil penalties from a later-enacted statute.  However, the PACT Act

penalties do serve as useful guideposts of Congressional intent in this area of regulation.  The

PACT Act, enacted in 2010, prohibits cross-border cigarette deliveries unless, inter alia, state

---

[10] The Court notes that the Gore culpability factor may not always be entirely applicable in the case of
statutory civil penalties, as such penalties may be authorized without any particular finding of scienter.
See, e.g., Infinity Outdoor, Inc. v. City of New York, 165 F. Supp. 2d 403, 430-31 (E.D.N.Y. 2001)
(rejecting constitutional challenge to city signage regulation imposing civil penalties without scienter
requirement); United States v. City of New York, 481 F. Supp. 4, 7 (S.D.N.Y. 1979) ("The civil penalty
provision (of 33 U.S.C. s 1321(b)(6)) is clearly one of strict liability . . . and every court which has
considered the question has so held."); see also Kansas v. Hendricks, 521 U.S. 346, 362 (1997) (noting
that a scienter requirement can be "an important element in distinguishing criminal from civil statutes").

and local taxes have been pre-paid.  Cross-border deliveries consist principally of cigarette shipments from low-tax states (or Native American reservations) to high-tax states.  PACT Act offenses can also lead to CCTA violations, because upon arrival in a high-tax state, the cigarettes are not affixed with the tax stamp of the jurisdiction in which the cigarettes are found.  The PACT Act was passed in order to:

> (3) provide government enforcement officials with more effective enforcement tools to combat tobacco smuggling;
>
> (4) make it more difficult for cigarette and smokeless tobacco traffickers to engage in and profit from their illegal activities;
>
> (5) increase collections of Federal, State, and local excise taxes on cigarettes and smokeless tobacco…

PACT Act findings, § 1(c) (3)–(5) (appended to 15 U.S.C. § 375); see also 155 Cong Rec. S5822-01, 5853 (daily ed. May 21, 2009) (statement of Senator Kohl) (noting that cigarette trafficking "has developed into a popular, and highly profitable, means of generating revenue for criminal and terrorist organizations.").  These purposes closely mirror those of the CCTA.  See 151 Cong. Rec. at H. 6284 (daily ed. July 21, 2005) (statement of Rep. Coble) (urging support of CCTA amendments to strengthen enforcement efforts because "criminal organizations, including terrorist groups, are using contraband cigarettes to fund their organizations"); H.R. Conf. Rep. 95-1778, 95th Cong., 2nd Sess., 1978 U.S.C.C.A.N. 5535 (Oct. 12, 1978) (conference report on CCTA, finding widespread cigarette trafficking related to racketeering and organized crime); S. Rep. 95-962, 95th Cong., 2nd Sess., 1978 U.S.C.C.A.N. 5518 (June 28, 1978) (noting that purpose of CCTA is "to provide a timely solution to the serious problem of organized crime and other large scale operations of interstate cigarette bootlegging" that deprive states of "literally hundreds of millions of dollars" in tax revenue).

The PACT Act has enforcement provisions that are also very similar to the CCTA's:

> A State, through its attorney general, or a local government or Indian tribe that
> levies a tax subject to section 2A(a)(3), through its chief law enforcement officer,
> may bring an action in a United States district court to prevent and restrain
> violations of this Act by any person or to obtain any other appropriate relief from
> any person for violations of this Act including civil penalties, money damages,
> and injunctive or other equitable relief.

15 U.S.C. § 378(c).  However unlike the CCTA, the PACT Act expressly provides for penalty amounts:

> (1) In general. Except as provided in paragraph (3), whoever violates this Act
> shall be subject to a civil penalty in an amount not to exceed – (A) in the case of a
> delivery seller, the greater of —
>
> (i) $ 5,000 in the case of the first violation, or $ 10,000 for any other violation; or
>
> (ii) for any violation, 2 percent of the gross sales of cigarettes or smokeless
> tobacco of the delivery seller during the 1-year period ending on the date of the
> violation.

15 U.S.C. § 377(b).[11]

Because the defendants are liable for an enormous number of individual CCTA

violations, the City concedes that § 377(b)(1)(A)(i) would suggest an excessive penalty amount

if the per violation measure were used. Accordingly, the City argues that the Court should

impose a penalty up to 2% of each defendant's gross sales of unstamped cigarettes to Native

American reservations after April 30, 2008.  The City further argues that the traditional factors

for determining a discretionary civil penalty militate in favor of the maximum civil penalty in

this case because:  in continuing to engage in massive sales of unstamped cigarettes after

---

[11] The Second Circuit recently held that the District Court for the Western District of New York did not
abuse its discretion in entering a preliminary injunction that enjoined enforcement of the PACT Act's
provision that all out-of-state cigarette "delivery sellers" must prepay the taxes of the state where they
deliver cigarettes, based on the district court's conclusion that due process requires a person to have
minimum contacts with a state before they made be subjected to that state's tax laws.  See Red Earth LLC
v. United States, 657 F.3d 138 (2d Cir. 2011).  This litigation left untouched, however, the remainder of
the PACT Act, including provisions that prohibit using the US Postal Service to mail cigarettes and that
require age-verification. Id. at 143.  It also had no relation to the validity of the Act's penalty provisions.

Milhelm I, the defendants showed clear culpability; there is a great deal of public harm caused by their sales, in the form of both tax losses and increased smoking; the defendants appear to have made huge profits out of their opportunistic conduct; and the defendants have refused to offer any evidence that they are unable to pay a substantial amount.  Under the PACT Act calculation of 2% of gross sales after April 30, 2008, the amounts would be $7,301,830 for Gutlove and $7,480,872 for Pennisi.

Notably, the PACT Act's civil penalty amounts are far lower than the penalties to which the defendants could have been liable under Article 20 of the New York Tax Law, which also provides a useful metric of "the civil penalties authorized or imposed in comparable cases." Under § 481 of the New York Tax Law, for example, an "agent or distributor" who fails to pay required cigarette taxes "shall be subject to a penalty of ten per centum of the amount of tax determined to be due as provided in this article plus one per centum of such amount for each month or fraction thereof during which such failure continues . . ., not exceeding thirty per centum in the aggregate."  N.Y. Tax L. § 481(a)(i)(A).  The City has presented evidence that Gutlove and Pennisi sold 10,537,885 and 11,127,538 cartons, respectively, of unstamped cigarettes to Native American reservations after April 30, 2008.  Using the lower state tax rate of $15/carton that was in effect until June 2008, this would amount to total outstanding tax liabilities of around $158 million and $167 million.  Thus, even the lowest penalty under § 481 of 10% these amounts would be around $16 million for each defendant.

Moreover, the PACT Act penalty amounts are not out of step with the harm or potential harm caused by the defendants' conduct.  Based on fairly conservative figures premised on the activities of two bootleggers, the City has estimated that at least 9,000 cartons of cigarettes per week were trafficked from Poospatuck reservation into the City.  Applying a City tax rate of

55

$15/carton, this would amount to around $7 million in tax revenue owing to the City each year. (See Pl. Mem. at 58-61.)  And, of course, based on estimates that the defendants were each selling around 4 million cartons of unstamped cigarettes per year, the state was deprived of around $60 million in tax revenue yearly from each defendant's sales.

Finally, based on the fact that the City's claims for relief are limited to the defendants' conduct post-dating the motions to dismiss, the reprehensibility of the defendants' continued sales is clearly at issue.  Although the Court is mindful that its April 30, 2008 Order was not a final judgment or an injunction, certainly the defendants cannot claim any ignorance to the consequences of their conduct after that point.  Indeed, as noted previously, the defendants have long been on notice of the detrimental public effects of their business activities, and the large volume of unstamped cigarette sales to non-Native Americans from the Poospatuck reservation. The defendants made a conscious choice to build their business model on the non-payment of cigarette taxes, and it is proper for them to be held accountable for some of the costs of their conduct.  On the other hand, the Court believes that a penalty award in this case should take some account of the fact that state tax authorities actively acquiesced in the defendants' business model for years, despite actual knowledge that large amounts of untaxed cigarettes were being sold and distributed to non-Native Americans as a result of the forbearance regime.  The award should also keep in mind the degree to which deterrence remains necessary, in light of the Tax Law Amendments and the defendants' apparent cessation of unstamped cigarette sales.

In sum, the Court believes that using the PACT Act calculations as a starting point for an award of civil penalties is appropriate, and would not violate due process.  The Court's determination of a civil penalty up to these amounts will be guided by traditional factors, including the good or bad faith of the defendants, the injury to the public, and the defendants'

ability to pay.   In determining the defendants' ability to pay, the Court will take note of their gross and net profits from their business of selling unstamped cigarettes.

The defendants Gutlove and Pennisi have submitted little evidence to controvert the City's submissions.  They argue, however, that they are entitled to an evidentiary hearing prior to any award of civil penalties. Although it is not entirely clear what showing they intend to make or what evidence of the City's they seek to challenge, the Court nonetheless concludes that the defendants should be afforded an opportunity to be heard on the appropriate civil penalty amount, based on the standards described above.

## IV.  THE CMSA

### A.  Liability

The City has maintained a pendent CMSA claim, and now argues that it is entitled to summary judgment on the defendants' CMSA liability.  Interestingly, however, the City is only pursuing attorney's fees under the CMSA, not any other form of relief.  For the reasons stated, the Court concludes that neither side is entitled to judgment as a matter of law at this time, and the cross-motions for summary judgment are therefore denied.

The CMSA, N.Y. Tax L. §§ 483-89, "prohibits the sale of cigarettes below cost when the seller intends thereby to harm competition or evade taxes."  Lorillard Tobacco Co. v. Roth, 99 N.Y.2d 316, 318 (2003). The statute makes it unlawful for

> any agent, wholesale dealer or retail dealer, with intent to injure competitors or destroy or substantially lessen competition, or with intent to avoid the collection or paying over of such taxes as may be required by law, to advertise, offer to sell, or sell cigarettes at less than the cost of such agent wholesale dealer or retail dealer, as the case may be.

N.Y. Tax L. § 484(a)(1).  The statute defines the "cost of such agent" as the "basic cost of cigarettes" plus general costs of doing business borne by the agent. N.Y. Tax L. § 483(b)(1)(A).

In turn, the "basic cost of cigarettes" is defined as "the invoice cost of cigarettes to the agent ... to which shall be added the full face value of any stamps which may be required by law." Id. § 483(a)(1). The CMSA further provides that advertising, offering to sell, or selling cigarettes at less than cost "shall be prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition, or of intent to avoid the collection or paying over of such taxes as may be required by law." Id. § 484(a)(6).

In Milhelm Attea I, the Court already held that "the 'basic cost of cigarettes' and the 'cost of such agent,' for purposes of § 483, include the costs of tax stamps required by § 471," and that the City's allegations that the "defendant wholesalers sell cigarettes to reservation retailers for re-sale to the public at prices that do not include the costs of tax stamps required by § 471" stated a claim under the CMSA.  See Milhelm Attea I, 550 F. Supp. 2d at 349.  The City has now presented ample evidence that Gutlove and Pennisi sold cigarettes to reservation retailers for re-sale to the public at prices that did not include the cost of tax stamps required by § 471.  Each defendant thus sold large quantities of cigarettes at less than the "cost of the agent," in violation of the CMSA.

CMSA minimum price calculations confirm the defendants' sales of below-cost cigarettes. The method for calculating CMSA minimum prices is set forth in Golden Feather, 2009 WL 2612345, at *4-6.  To arrive at the appropriate price calculation, the Court must add the "basic cost of cigarettes" (i.e., "the invoice cost of cigarettes to the agent who purchases from the manufacturer" plus "the full face value of any stamps which may be required by law") to "the cost of doing business by the agent" (which is statutorily presumed to be 3.875% of the "basic cost of cigarettes" plus 20 cents). Id.; see N.Y. Tax L. § 483(a)(1) and (b)(1)(A) and (B). New York State cigarette tax stamps cost $15 per carton from 2002 until June 3, 2008, when the tax

increased to $27.50 per carton. See Golden Feather, 2009 WL 2612345, at *6; N.Y. Tax L. §

471(1) (2002). The cost of New York State tax stamps increased again, to $43.50 per carton,

effective July 1, 2010. See N.Y. Tax L. § 471(1) (2011); Laws 2010, Ch. 134 § 26.

The City has provided the following tables, comparing Gutlove and Pennisi's sale prices

of Newport cigarettes to the applicable CMSA minimums:

### Gutlove Sale Prices (Newport) Compared to CMSA Minimums

| Date | Mf'r. List Price | Mf'r Discount | NY State Tax | Basic Cost of Cigarettes | CMSA Minimum Price | Gutlove Sale Price |
|------|------|------|------|------|------|------|
| 6/6/2008 | $30.14 | $6.00 | $27.50 | $51.64 | $53.85 | $25.15 |
| 9/30/2008 | $30.14 | $0.00 | $27.50 | $57.64 | $60.08 | $31.15 |
| 1/2/2009 | $31.14 | $0.00 | $27.50 | $58.64 | $61.12 | $32.25 |
| 2/27/2009 | $32.14 | $0.00 | $27.50 | $59.64 | $62.16 | $33.25 |
| 3/26/2009 | $39.24 | $0.00 | $27.50 | $66.74 | $69.53 | $40.35 |

### Pennisi Sale Prices (Newport) Compared to CMSA Minimums

| Date | Mf'r. List Price | Mf'r Discount | NY State Tax | Basic Cost of Cigarettes | CMSA Minimum Price | Pennisi Sale Price |
|------|------|------|------|------|------|------|
| 6/23/2008 | $30.14 | $6.00 | $27.50 | $51.64 | $53.85 | $25.15 |
| 10/7/2008 | $30.14 | $0.00 | $27.50 | $57.64 | $60.08 | $31.15 |
| 12/26/2008 | $31.14 | $0.00 | $27.50 | $58.64 | $61.12 | $32.25 |
| 2/22/2009 | $32.14 | $0.00 | $27.50 | $59.64 | $62.16 | $33.25 |
| 3/23/2009 | $39.24 | $0.00 | $27.50 | $66.74 | $69.53 | $40.35 |

(See Proshansky Decl., Ex. 7, 16.)  The data in these tables thus confirm that Pennisi and

Gutlove sold cigarettes far below the CMSA minimum prices.  Gutlove and Pennisi are not

disputing this evidence or the price calculations.

Notwithstanding the above evidence, the Court nonetheless concludes that the City has

not succeeded in demonstrating an entitlement to summary judgment on its CMSA claims.  To

begin with, the Court harbors serious doubts whether on the current record and rather cursory briefing, the issue of whether the defendants possessed the requisite intent to harm competition or evade taxes could be resolved as a matter of law.  See Lorillard, 99 N.Y.2d at 324 (noting that "the CMSA only establishes a presumption that sale below cost are made with the proscribed intent . . . necessarily leaving the application to concrete cases for the appropriate enforcing authorities and the courts" and sellers are "are free to attempt to rebut this presumption factually in any enforcement action," even where they engaged in below-cost sales).

## B.  Relief

Moreover, even if the City were entitled to summary judgment on the issue of liability, it has not persuaded the Court that it is entitled to collect attorney's fees in these circumstances. The CMSA relief provisions, Tax L. § 484(b), provide that:

> 1. An action may be maintained in the supreme court to prevent, restrain or enjoin a violation, or threatened violation, of any of the provisions of this article. Such an action may be instituted by any person injured by any violation or threatened violation of this article, or by the tax commission. If in such action a violation or threatened violation of this article shall be established, the court shall enjoin and restrain, or otherwise prohibit, such violation or threatened violation. In such action it shall not be necessary that actual damages to the plaintiff be alleged or proved, but where alleged and proved, the plaintiff in said action, in addition to such injunctive relief and costs of suit, including reasonable attorney's fees, shall be entitled to recover from the defendant the actual damages sustained by such plaintiff.

> 2. In the event that no injunctive relief is sought or required, any person injured by a violation of this article may maintain an action for damages and costs of suit in the supreme court as provided for in the civil practice law and rules.

At the Court's request, the parties have submitted additional letters disputing whether attorney's fees are recoverable in an action that does not seek damages.  The defendants argue that under paragraph 1, attorney's fees are only awardable in an action where damages are "alleged and proved."  However, based on the most natural reading of the statutory language, as well as the

authorities cited in the City's letter dated March 12, 2012, the Court concludes that attorney's fees would be awardable in an action seeking either injunctive relief or damages under the CMSA.

This conclusion, however, does not end the inquiry. The CMSA allows for a court to award attorney's fees in addition to an award of either "injunctive relief" or "damages . . . alleged and proved." The City is currently seeking neither and has only asserted claims for substantive relief under the CCTA. The City has not argued that its claims for civil penalties or disgorgement of profits are awardable under the CMSA, nor has it cited to any state law authority supporting that proposition. The City offers only the cursory assertion that "[i]t does not matter that the City's present motion does not seek an injunction. The City certainly brought suit in order to 'restrain or enjoin a violation' of the CMSA." (Pl. Ltr., DE #383, at 2.) But this statement does not explain why the City would be entitled to attorney's fees where it has abandoned all claims for substantive judicial relief under the statute allowing for them, and the City has not cited any statutory or case law indicating that a New York court would award CMSA attorney's fees in these circumstances. Cf. Buckhannon Bd. and Care Home Inc. v. West Virginia Dep't of Health and Human Resources, 532 U.S. 598, 606 (2001) ("We cannot agree that the term 'prevailing party' authorizes federal courts to award attorney's fees to a plaintiff who . . . has reached the 'sought-after destination' without obtaining any judicial relief."). The Court declines to embroil itself sua sponte in such questions of state law.

Accordingly, based on the legal and factual gaps that remain outstanding, the Court denies the cross-motions for summary judgment on the City's CMSA claim against Gutlove and Pennisi.

## V.   PUBLIC NUISANCE

The defendants argue that they are entitled to summary judgment on the City's public nuisance claim under City of New York v. Smokes-Spirits.com, 12 N.Y.3d 616 (2009).  The City makes little attempt to defend the nuisance claim, other than to cursorily assert that there are "outstanding issues of fact," but also states that "the City does not intend to prove up its public nuisance claim assuming summary judgment is granted on the CCTA or CMSA claims and would withdraw the public nuisance claim in that event."  (Pl. Mot. at 56 n. 39.)

Accordingly, given that the Court has already determined that the City is entitled to civil penalties under the CCTA, the Court deems the City's public nuisance claim withdrawn and need not address the parties' arguments surrounding the Smokes-Spirits case.

## CONCLUSION

For the reasons stated, the Court grants summary judgment in full to Day Wholesale, based on the City's lack of standing.  As to Gutlove and Pennisi, the Court concludes that the City is entitled to summary judgment on those defendants' liability under the CCTA, and the City's entitlement to some award of civil penalties.  The Court will hold a further hearing to determine the appropriate penalty amount.  Also as to those defendants, the Court denies the parties' cross-motions for summary judgment on the City's CMSA claim, and deems the public nuisance claim withdrawn.

The Court directs the City to confer with Gutlove and Pennisi regarding any further discovery to be exchanged, and the parties' anticipated presentations at the hearing.  Within 30 days, the parties should submit a joint pre-hearing order that contains the witness testimony and exhibits that each party anticipates introducing at the hearing, as well as any objections to

opponents' proffered evidence.  At that time, the Court will set a date for the hearing and/or a

pre-hearing conference.

    SO ORDERED.

Dated: Brooklyn, New York
   August 17, 2012

                 _____/s/_____
                 Carol Bagley Amon
                 Chief United States District Judge